589 S.E.2d 204

**Johnny CRAWFORD and Joan Wilson, Plaintiffs,**

**Of whom Johnny Crawford is, Appellant,**

v.

**Janice HENDERSON, Respondent.**

**No. 3694.**

Court of Appeals of South Carolina.

Heard April 9, 2003.

Decided Nov. 17, 2003.

Samuel Darryl Harms, of Greenville, for appellant.

Karl S. Brehmer and J. Austin Hood, both of Columbia, for respondent.

CONNOR, J:

Johnny Crawford brought suit against Janice Henderson and his underinsured motorist carrier ("UIM"), Southern Heritage Insurance Company, seeking to recover damages from injuries suffered in an automobile accident. The jury awarded Crawford $1,099.38 in actual damages. On appeal, Crawford asserts the circuit court erred in quashing Crawford's subpoena to depose Henderson a second time. He contends the UIM carrier's attorney should not have been able to claim an attorney-client privilege to limit the first deposition based on the following reasons: (1) an attorney-client privilege did not exist between Henderson and the UIM carrier's attorney; and (2) any alleged attorney-client privilege was waived by counsel's failure to file a motion for a protective order pursuant to Rule 30(j)(3), SCRCP. Finally, Crawford contends the circuit court erred in permitting a nurse practitioner to give an opinion regarding the cause of Crawford's injuries. We affirm in part, reverse in part, and remand.

## FACTS

This case arose out of an automobile accident between Janice Henderson and Johnny Crawford. While leaving a gas

station, Henderson pulled out into traffic on Highway 290 in Duncan and was struck by Crawford. Henderson testified she did not immediately see Crawford's vehicle because a truck that was entering the gas station blocked her line of sight.

Crawford sued Henderson seeking to recover damages for injuries both he and his passenger, Joan Wilson, suffered in the accident. After Crawford and Wilson settled the liability limits of Henderson's policy and entered into a covenant not to execute any judgment against Henderson, they sought to recover damages from Southern Heritage Insurance Company ("Southern"), the UIM carrier.

Crawford attempted to take Henderson's deposition four times. Each time, Crawford served Southern's attorney, Karl Brehmer, with the notices of the depositions. Henderson failed to appear. Ultimately, Crawford filed a motion in circuit court seeking an order to compel Henderson to appear for her deposition or be held in contempt.

At the hearing, Brehmer appeared and informed the court that he represented the UIM carrier and had no control over Henderson. Counsel claimed he had attempted to find Henderson in order to get her to appear for a deposition.

After hearing arguments, the circuit court found Brehmer represented Henderson in name only and, therefore, Crawford would have to personally serve Henderson with the notice of deposition. The court reasoned, "[Counsel] does represent [Henderson], ... for purposes of litigating liability and damages. But for purposes of paying money, ... it's very clear that he represents the insurance carrier and he made that clear."

Crawford served Henderson and she appeared for a deposition on February 21, 2001. During the deposition, Crawford's counsel asked Henderson if she had discussed the case with Brehmer prior to the deposition and asked her to relate the substance of the conversations. Brehmer instructed Henderson not to answer the question asserting the answer would violate the attorney-client privilege. Henderson did not answer the question and the deposition was concluded.

Crawford served Henderson with a second subpoena and notice of deposition scheduled for June 19, 2001. On June 4, 2001, Brehmer filed a motion for a protective order pursuant to Rules 26(c) and 30(a)(2) of the South Carolina Rules of Civil Procedure.[1] Counsel contended Crawford had already taken Henderson's deposition, the parties had not agreed to multiple depositions, and good cause did not exist to compel an additional deposition. In response, Crawford moved to quash the motion for a protective order on the following grounds: (1) Henderson had not been served with the motion; (2) Brehmer could not assert the attorney-client privilege because he had previously stated he was not Henderson's attorney; and (3) even if the attorney-client privilege existed, it was waived because the procedural requirements of Rule 30(j)(3) of the South Carolina Rules of Civil Procedure, which permit a witness not to answer a deposition question, had not been met.

The circuit court granted Brehmer's motion for a protective order. As a result, Henderson's deposition was never reconvened and the case proceeded to trial. The jury returned a verdict in favor of the plaintiffs and awarded $1,099.38 to Crawford and $30,413.61 to Wilson. Crawford appeals.[2]

---

1. Rule 26(c) of the South Carolina Rules of Civil Procedure provides in pertinent part:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the circuit where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden by expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than selected by the party seeking discovery; (4) that certain matters not be inquired into or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court....

Rule 26(c), SCRCP.

Rule 30(a)(2) states in relevant part, "The deposition of any party or witness may only be taken one time in any case except by agreement of the parties through their counsel or by order of the court for good cause shown." Rule 30(a)(2), SCRCP.

2. Wilson is not a party to this appeal.

## DISCUSSION

### I. Existence of Attorney–Client Privilege

Crawford argues the circuit court erred when it granted Brehmer's motion for a protective order because, as a matter of law, an attorney-client relationship does not exist between a UIM carrier's attorney and an underinsured motorist, *i.e.*, the named defendant. Even if this relationship can be established, Crawford contends the conversations between Henderson and Brehmer were not protected by the attorney-client privilege.

### A.

Although this case presents several related issues, the threshold matter is to define the relationship created between a UIM carrier's attorney and the named defendant.

The attorney-client privilege protects against disclosure of confidential communications by a client to his or her attorney. *State v. Owens*, 309 S.C. 402, 407, 424 S.E.2d 473, 476 (1992). "The privilege is strictly construed to protect only confidences disclosed within the relationship." *Id.* at 407, 424 S.E.2d at 477. To establish an attorney-client privilege, the person asserting the privilege must show that the relationship between the parties was that of attorney and client and that the communications were confidential in nature. *Marshall v. Marshall*, 282 S.C. 534, 538–39, 320 S.E.2d 44, 47 (Ct.App. 1984). In order to obtain the status of a client, the person must communicate in confidence with an attorney for the purpose of obtaining legal advice. *Id.* at 539, 320 S.E.2d at 47. The advice or assistance must be sought with a view to employing the attorney professionally whether or not actual employment occurs. *Id.*

Initially, we note there is no contractual relationship between the UIM carrier's attorney and the named defendant. As conceded by Southern, a contract did not exist between Henderson and Southern. Instead, Crawford through his premium payment directly contracted with Southern.

Significantly, our Supreme Court has held the rights of the UIM carrier and the named defendant are not synonymous, and, in fact, may be conflicting. Even though our Supreme Court has not directly addressed the issue in the instant case,

we our guided by the analysis in *Broome v. Watts,* 319 S.C. 337, 461 S.E.2d 46 (1995). In *Broome,* Carol and John Broome sued Watts for injuries sustained in an automobile accident. Nationwide Mutual Insurance Company (Nationwide) insured Watts for policy limits in the amount of $50,000/ $100,000. The Broomes had underinsured motorist coverage with United Services Automobile Association (USAA). As required by section 38-77-160 of the South Carolina Code of Laws, the Broomes served USAA with the complaints.[3] USAA filed notices of appearance and motions for intervention in both cases. Shortly thereafter, the Broomes, Watts, and Nationwide entered into a settlement agreement in which Nationwide agreed to pay its $50,000 liability limits to the Broomes. Pursuant to the agreement, Watts waived her right to a jury trial and the Broomes agreed not to execute against Watts or Nationwide any judgment obtained against Watts. The Broomes, however, decided to proceed with an action to determine damages for purposes of UIM coverage. USAA was not a party to the agreement. USAA assumed the defense of the action under section 38-77-160, filed answers, and requested a jury trial. Over the Broomes' objections, the judge ordered a jury trial.

On appeal, the Broomes asserted USAA was bound by the settlement agreement. Because Watts is the named defendant, the Broomes contended the named defendant's waiver of a jury trial bound USAA even though it was not a party to the

---

3. Section 38-77-160 provides in pertinent part:

   No action may be brought under the underinsured motorist provision unless copies of the pleadings in the action establishing liability are served in the manner provided by law upon the insurer writing the underinsured motorist provision. The insurer has the right to appear and defend in the name of the underinsured motorist in any action which may affect its liability and has thirty days after service of process on it in which to appear. The evidence of service upon the insurer may not be made a part of the record. In the event the automobile insurance insurer for the putative at-fault insured chooses to settle in part the claims against its insured by payment of its applicable liability limits on behalf of its insured, the underinsured motorist insurer may assume control of the defense of action for its own benefit. No underinsured motorist policy may contain a clause requiring the insurer's consent to settlement with the at-fault party. S.C.Code Ann. § 38-77-160 (2002). Because there have been no substantive amendments made to this statute since the *Broome* decision, we cite to the most current version of the statute.

settlement agreement. Our Supreme Court rejected the Broomes' argument, finding that Watts could not give up USAA's right to a jury trial. *Broome*, 319 S.C. at 340, 461 S.E.2d at 48.

Citing section 38–77–160 and a case interpreting this statute, the Court found that a waiver by Watts was not "tantamount to a waiver by USAA, because it blurs the distinction between the named defendant (Watts) and the actual defendant (USAA) which must pay damages on behalf of the named defendant in the event of liability." *Broome*, 319 S.C. at 340, 461 S.E.2d at 48; *see Williams v. Selective Ins. Co. of the Southeast*, 315 S.C. 532, 534–35, 446 S.E.2d 402, 404 (1994) (holding that a UIM carrier is entitled to assume control of the defense on an action even if the insured chooses to settle with the at-fault driver's liability carrier). The Court concluded, "[a]lthough the UIM carrier 'steps into the shoes' of the underinsured motorist, it has rights separate and distinct from those of the underinsured motorist." *Broome*, 319 S.C. at 340, 461 S.E.2d at 48; *see also Ex parte Allstate Ins. Co.*, 339 S.C. 202, 528 S.E.2d 679 (Ct.App.2000) (holding in action to recover underinsured motorist benefits, the plaintiff was required to serve UIM carrier with action against underinsured motorist prior to trial; recognizing UIM carrier had rights that were separate and distinct from the underinsured motorist and was not in privity with underinsured motorist or his liability carrier).

Despite the Supreme Court's discussions in *Broome*, Southern[4] contends section 38–77–160 supports a "quasi attorney-client" relationship. Specifically, Southern claims the UIM carrier's attorney essentially becomes the attorney for the named defendant because he has stepped into the shoes of the defendant's original attorney who was retained by the liability insurance carrier. We disagree for several reasons. First, Southern has not cited nor have we found any authority that South Carolina recognizes a "quasi attorney-client relationship." Secondly, and most significantly, the Supreme

4. We note that although Henderson is the named Respondent, the Respondent's brief was filed on behalf of Southern's interests. Therefore, we refer to Southern and Brehmer, Southern's attorney, throughout our discussion.

Court established in *Broome* and *Williams* that the interests of a UIM carrier and a named defendant are separate and distinct. Clearly, once the named defendant has settled for his liability policy limits, he no longer has a stake in the outcome of the litigation. The UIM carrier, on the other hand, still has a viable, financial interest in the case. As a result, the attorney for the UIM carrier represents the carrier and not the named defendant. Even though the UIM carrier "steps into the shoes" of the named defendant, the procedure is not in totality but merely to the point of coverage. Thus, there is no direct relationship between the UIM carrier's attorney and the named defendant.

In addition to the lack of case law and statutory support for the creation of an attorney-client relationship in this situation, we find there are ethical considerations that would also prohibit it. These issues may be illustrated by comparing an established attorney-client relationship with the facts of the instant case.

First, if a relationship exists, the attorney has some degree of control over the client and the client, in turn, has some input in the outcome of the litigation. *See* Rule 1.2(a), RPC, Rule 407, SCACR ("A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter."). Here, the UIM carrier's attorney has no control over the named defendant because the attorney represents the insurance company and the named defendant no longer has an interest once a covenant not to execute is entered into with the defendant's liability carrier.

Secondly, under the normal situation, a plaintiff's attorney is not permitted to have direct contact with the defendant, but instead, must serve all pleadings and motions upon the defendant's attorney. *See* Rule 4.2, RPC, Rule 407, SCACR ("In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."). In the case at bar, the named

defendant and the UIM carrier must both be served with the pleadings. *See* S.C.Code Ann. § 38–77–160 (2002) ("No action may be brought under the underinsured motorist provision unless copies of the pleadings in the action establishing liability are served in the manner provided by law upon the insurer writing the underinsured motorist provision."); *Louden v. Moragne*, 327 S.C. 465, 486 S.E.2d 525 (Ct.App.1997) (holding named defendant in an action for benefits under a plaintiff's underinsured motorist policy must be properly served with summons and complaint).

Moreover, if an attorney-client relationship were permitted in this instance, there exists a problem with dual representation. Specifically, the question becomes whether the UIM carrier's attorney can simultaneously represent the insurance company and a named defendant who has no direct relationship with the UIM carrier and whose interests are separate and distinct. *See McNair v. Rainsford*, 330 S.C. 332, 344, 499 S.E.2d 488, 494 (Ct.App.1998) ("An attorney who represents more than one client must be cognizant of the vicissitudes of dual representation. Dual representation is not *per se* unethical, but raises a spectre of a violation of Rules 1.7 and 2.2 of the South Carolina Rules of Professional Conduct (RPC), Rule 407, SCACR."); *see* Rule 1.7, RPC, Rule 407, SCACR (outlining rules prohibiting attorney from representing client where there exists a conflict of interest).

### B.

Assuming arguendo that an attorney-client relationship can be created between a UIM carrier's attorney and the named defendant, Crawford asserts the attorney-client privilege could not be asserted under the facts of this case.

■ Brehmer specifically disclaimed the existence of an attorney-client relationship. He maintained Southern retained him to represent its interest pursuant to section 38–77–160. He also stated he had no right to control Henderson. Furthermore, other than Brehmer's appearance at Henderson's deposition and his claim that he conferred with Henderson prior to the deposition, there is no evidence that Brehmer acted as Henderson's legal advisor. From all indications, it seems that Brehmer appeared at the deposition in

order to represent Southern's interests. Based on our review of the record, Brehmer has not demonstrated that Henderson was his client. *See State v. Love*, 275 S.C. 55, 59, 271 S.E.2d 110, 112 (1980) (stating burden of establishing attorney-client privilege is upon the person asserting it). Even viewing the situation from Henderson's perspective, as Brehmer urges this Court to do, we find no evidence that she had a reasonable belief or expectation that Brehmer directly represented her.

Based on the foregoing, we hold the circuit court erred in quashing Crawford's subpoena to reconvene Henderson's deposition. Because any communications between Brehmer and Henderson were not protected by the attorney-client privilege, Crawford should have been permitted to question her in this regard. Accordingly, we remand for Crawford to take Henderson's deposition and, as a result, remand for a new trial.

## C.

Given our conclusion, we are cognizant of the policy concerns presented by Southern. Specifically, Southern asserts an attorney-client privilege should necessarily be created because there must be some level of confidentiality between an attorney for a UIM carrier and the named defendant. Without this protection, Southern claims a UIM carrier's attorney's ability to defend the case will be adversely affected.

As previously discussed, case law, statutes, and ethical rules compel our holding that an attorney-client relationship is not established between a UIM carrier's attorney and a named defendant. Moreover, to hold otherwise would effectively limit the benefits a plaintiff receives from purchasing UIM coverage.

To avoid the predicament alleged by Southern, it is incumbent upon a UIM carrier's attorney to inform the named defendant of the parameters of his or her representation. Specifically, the attorney should emphasize that he or she directly represents the carrier and treat the named defendant essentially as a witness. We note that this procedure does not leave the named defendant without direct representation. Contractually, the named defendant's liability carrier remains obligated to the insured even after the liability limits have

been paid. *See Cobb v. Benjamin,* 325 S.C. 573, 584, 482 S.E.2d 589, 594 (Ct.App.1997) (finding the language of section 38–77–160 "giving the UIM carrier the right to assume control of the defense for its own benefit is ... consistent with the recognition that the liability carrier who has paid its limits no longer has the same stake in the outcome, even though the contractual obligation to its insured to defend is ongoing").

## II. Waiver of Attorney–Client Privilege

Even assuming that Brehmer could assert the attorney-client privilege, Crawford argues it was waived because he failed to comply with the procedural requirements of Rule 30(j) of the South Carolina Rules of Civil Procedure.[5]

Rule 30(j), which governs the conduct of counsel during depositions, provides in relevant part:

Counsel shall not direct or request that a witness not answer a question, unless that counsel has objected to the question on the ground that the answer is protected by a privilege or a limitation on evidence directed by the court or unless that counsel intends to present a motion under Rule 30(d), SCRCP. In addition, counsel shall have an affirmative duty to inform a witness that, unless such an objection is made, the question must be answered. Counsel directing that a witness not answer a question on those grounds or allowing a witness to refuse to answer a question on those grounds ***shall move the court for a protective order under Rule 26(c), SCRCP, or 30(d), SCRCP, within five business days of the suspension or termination of the deposition. Failure to timely file such a motion will constitute waiver of the objection, and the deposition may be reconvened.***

Rule 30(j)(3), SCRCP (emphasis added).

■ Neither Brehmer nor Henderson filed a motion for a protective order within five business days of the termination of the deposition. Because the language of Rule 30(j)(3) is mandatory, any assertion of the attorney-client privilege during the deposition was waived. *See Collins v. Doe,* 352 S.C. 462,

---

**5.** In light of our holding that an attorney-client relationship is not created, we need not address this argument. However, because Rule 30(j) is relatively new with limited application, we decide to analyze this issue. Moreover, it provides additional support for our conclusion that the circuit court erred in denying Crawford's right to thoroughly depose Henderson.

470, 574 S.E.2d 739, 743 (2002) ("Under the rules of statutory interpretation, use of words such as 'shall' or 'must' indicates the legislature's intent to enact a mandatory requirement.").

Despite the requirements of Rule 30(j)(3), Brehmer argues and the circuit court agreed that Crawford failed to sustain his burden to obtain a second deposition under Rule 30(a)(2), which provides in relevant part, "The deposition of any party or witness may only be taken one time in any case except by agreement of the parties through their counsel or by order of the court for good cause shown." Rule 30(a)(2), SCRCP. Additionally, Brehmer contends Rules 30(a)(2) and 30(j)(3) are in conflict, thus, Crawford still needed to comply with the requirements of Rule 30(a)(2).

However, according to the language of Rule 30(j)(3), Crawford was not required to subpoena the court for a second deposition but was instead permitted to reconvene the first deposition. Given the language of Rule 30(j)(3) allows for the reconvening of the first deposition, it does not conflict with the rules governing the procedure to obtain a second deposition as specified under Rule 30(a)(2).

Finally, Brehmer asserts Henderson's deposition should not be reconvened because Crawford allowed the first deposition to proceed after the objection and did not call the trial judge to obtain an immediate ruling. Crawford, however, was not required to do so. Rule 30(j)(3) requires the party asserting the privilege to file the motion for a protective order within five business days of either the suspension or termination of the deposition. The language of Rule 30(j)(3) specifying termination of the proceedings permits the deposition to be concluded after its normal course. Therefore, we find the circuit court erred when it denied Crawford the right to reconvene Henderson's deposition. Accordingly, we remand the case for a new trial after the conclusion of the deposition.

### III. Expert Witness Testimony of Nurse Practitioner

Crawford argues the circuit court erred when it permitted a nurse practitioner who treated Crawford to testify regarding causation given Southern failed to establish the nurse was an expert for purposes of rendering medical diagnoses.[6]

---

6. Based on our decision to reconvene Henderson's deposition, which will inevitably precipitate a new trial, we need not address Crawford's

At trial, the parties disputed whether Crawford's injuries were caused by the accident or if the injuries were pre-existing from an accident Crawford suffered at work. Crawford testified his right shoulder began to hurt approximately fifteen to twenty minutes after the accident on April 3, 1998. That night, Crawford went to the emergency room where he was given a prescription for pain medication and a muscle relaxant. Nine days later, Crawford sought treatment for his shoulder at an urgent care center. A few days later, Crawford went to an orthopedic specialist, Dr. Postma. Dr. Postma prescribed physical therapy for Crawford's shoulder. Shortly after his last physical therapy appointment, Dr. Postma performed a shoulder manipulation while Crawford was under anesthesia. After the procedure, Crawford went to a pain management center where Dr. Haasis gave Crawford cortisone shots. In his deposition, Dr. Haasis testified he believed Crawford's injuries were secondary to the automobile accident. Crawford submitted medical bills in the amount of $25,849.21.

During his testimony, Crawford relayed that on March 17, 1998, he was injured at work when his shirt got caught in a "mixer machine." As a result of the work-related accident, Crawford sustained injuries that included abrasion burns on his right arm. He testified he planned to return to work on Monday when the accident happened on the previous Friday.

In contrast, Henderson testified Crawford did not show any signs of injuries. She stated Crawford was upset and moving around after the accident.

Southern presented the testimony of Victoria Smith, a family nurse practitioner who treated Crawford. Smith testified she saw Crawford on July 29, 1997. On that day, Crawford complained of pain in his right shoulder. When questioned about the results of her physical examination of Crawford, Smith opined that Crawford suffered from bursitis in his right shoulder. Based on this assessment, Smith prescribed medication and physical therapy.

On April 6, 1998, three days after the automobile accident, Smith again saw Crawford. On that day, Crawford com-

---

remaining issue. However, because this issue may arise during a second trial, we decide it for the benefit of the parties.

plained of pain in his right shoulder and upper arm. Smith testified Crawford also told her about the injuries he had sustained in the work-related accident. Counsel then asked Smith whether Crawford was suffering from bursitis that day. Crawford's counsel objected to the question on the grounds that Smith was not a medical doctor and, therefore, was not qualified to give a medical diagnosis. The judge overruled the objection. Smith testified Crawford was not suffering from bursitis, thus, implying Crawford was still experiencing the effects of the work-related injury on that day.

■ "For a court to find a witness competent to testify as an expert, the witness must be better qualified than the jury to form an opinion on the particular subject of the testimony." *Mizell v. Glover*, 351 S.C. 392, 406, 570 S.E.2d 176, 183 (2002); *see* Rule 702, SCRE ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.").

■ Whether to qualify a witness as an expert and admit the expert's testimony is left to the discretion of the trial court and will not be overturned absent an abuse of that discretion. *Payton v. Kearse*, 329 S.C. 51, 60–61, 495 S.E.2d 205, 211 (1998). An abuse of discretion occurs when the trial court commits an error of law or makes a factual conclusion without evidentiary support. *Lee v. Suess*, 318 S.C. 283, 285, 457 S.E.2d 344, 345 (1995).

In support of his argument, Crawford cites a case in which this Court held a physical therapist was not qualified to testify regarding causation of the plaintiff's injuries. *Nelson v. Taylor*, 347 S.C. 210, 553 S.E.2d 488 (Ct.App.2001). Based on *Nelson*, Crawford argues that nurse practitioners are also not statutorily authorized to make medical diagnoses and should not be qualified as experts regarding medical diagnoses.

In *Nelson*, Pamela Nelson (Nelson) and her husband brought a negligence action against Taylor for personal injuries resulting from an automobile accident. As a result of the accident, Nelson complained of pain in her back, neck, head, and shoulder. Nelson was treated by her family physician, an

orthopedic surgeon, a neurosurgeon, a shoulder specialist, a chiropractor, and a physical therapist. At trial, contradicting theories emerged concerning the cause of Nelson's injuries. The physical therapist concluded that Nelson's injuries stemmed from her use of a mouse at her computer workstation, resulting in rotator cuff tendonitis. The shoulder specialist disagreed finding Nelson's injuries were caused by the automobile accident. He also ruled out rotator cuff tendonitis. In a deposition, the orthopedic surgeon found no evidence of shoulder impingement. The jury awarded Nelson significantly less than what she offered as her medical expenses.

On appeal, Nelson argued the trial judge erred in admitting the physical therapist's deposition concerning the medical cause of her injuries. *Nelson*, 347 S.C. at 213, 553 S.E.2d at 489. During the physical therapist's deposition, Nelson had objected to the physical therapist's diagnosis of her injuries because he was not a medical doctor and had not reviewed Nelson's medical records or diagnostic test results. This Court reversed the judge's decision to admit the testimony. *Id.* at 216–17, 553 S.E.2d at 491. In reaching this conclusion, we reviewed the statutory scheme created by the General Assembly to define and regulate the practice of physical therapy. Based on the controlling statutes, we determined that a physical therapist is limited in terms of methods of treatment and is not authorized to practice medicine, prescribe medications, or order medical laboratory tests. *Id.* at 215–16, 553 S.E.2d at 490–91. In view of these statutory restrictions, we held the physical therapist was not qualified to testify regarding causation. *Id.* at 216–17, 553 S.E.2d at 491.

*Nelson* is distinguishable from the instant case. First, as will be discussed, the statutory and regulatory provisions governing the practice of nursing are significantly different from those defining the parameters of physical therapy. Secondly, the statute that prohibits a physical therapist from practicing medicine specifically excludes nurse practitioners from this limitation. *See* S.C.Code Ann. § 40–45–310 (2001) ("Nothing in this chapter shall be construed to restrict, inhibit, or limit the practice of licensed nurse practitioners. . . .").

Although the holding in *Nelson* is not dispositive, it is, nevertheless, instructive for our analysis of the issue present-

ed in the instant case. As in *Nelson,* we must review the General Assembly's statutory scheme regulating nurse practitioners.

Section 40–33–10 defines several aspects of nursing. S.C.Code Ann. § 40–33–10 (2001 & Supp.2002). Relevant to this case are subsections (f) and (g), which define the practice of nursing and the practice of professional nursing. As provided in these subsections, the process of nursing includes direct care and treatment services, which includes the implementation of a physician-prescribed regimen as well as the assessment and nursing diagnosis of health problems. S.C.Code Ann. § 40–33–10(f), (g) (2001). In addition to these responsibilities, a professional nurse "may perform additional acts in the extended role requiring special education and training which are agreed to jointly by both the Board of Nursing and the Board of Medical Examiners. Those additional acts agreed to by both boards must be promulgated by the Board of Nursing in its regulations." S.C.Code Ann. § 40–33–10(g) (2001).[7]

---

7. Subsection (f) provides:

"Practice of nursing" means the provision of services for compensation that assist individuals and groups to obtain or maintain optimal health. Nursing practice is commensurate with the educational preparation and demonstrated competencies of the individual who is accountable to the public for the quality of nursing care. Nursing practice includes the provision of direct care and treatment services including the implementation of a medical regimen as authorized and prescribed by a licensed physician, dentist, or other person authorized by law, teaching, counseling, administration, research, consultation, supervision, delegation, and evaluation of practice. Nursing process includes the assessment and nursing diagnosis of human responses to actual or potential health problems and the planning, intervention, and evaluation of care in the promotion and maintenance of health, the casefinding and nursing management of illness, injury, or infirmity, the restoration of optimum function, or the achievement of a dignified death.

S.C.Code Ann. § 40–33–10(f) (2001).

Subsection (g) provides:

"Practice of professional nursing" means the performance for compensation of any acts in the health care process involving the process of assessment, intervention, and evaluation. This process includes observation, care, and counsel of the ill, injured, infirm, the promotion and maintenance of health, the administration of medications, and treatments as authorized and prescribed by a licensed physician or a licensed dentist. The application of the nursing

■ Turning to the specifics of this case, the role of a nurse practitioner is described in the regulations governing the practice of nursing as follows:

"Nurse Practitioner" means a registered nurse who has completed a post-basic or advanced formal education program acceptable to the Board, and who demonstrates advanced knowledge and skill in assessment and management of physical and psychosocial health-illness status of individuals, and/or families, and/or groups. Nurse practitioners who manage delegated medical aspects of care must have a supervising physician and operate within the "approved written protocols."

26 S.C.Code Ann. Regs. 91–2(d) (Supp.2002); *see* 26 S.C.Code Ann. Regs. 91–6(h)(1) (Supp.2002) ("A Nurse Practitioner or Clinical Nurse Specialist practicing in an extended role shall perform delegated medical acts pursuant to an approved written protocol between the nurse and the physician.").

The regulations define the terms "delegated medical acts" and "approved written protocols." " 'Delegated Medical Acts' means those additional acts delegated by the physician that include formulating a *medical diagnosis* and initiating, continuing, and modifying therapies, including prescribing drug therapy, under approved written protocols." 26 S.C.Code Ann. Regs. 91–1(c) (Supp.2002) (emphasis added); *see* 26 S.C.Code Ann. Regs. 91–6(h)(2)(b) (Supp.2002) (outlining at minimum information that should be included as "delegated medical acts"). " 'Approved Written Protocols' means specific statements developed collaboratively by the physician or the medical staff and the nurse that establish physician delegation for medical aspects of care, including the prescription of medications." 26 S.C.Code Ann. Regs. 91–2(g) (Supp.2002).

---

process requires substantial specialized independent judgment and skill and is based on knowledge and application of the principles of biophysical and social sciences. The practice of professional nursing includes the teaching and administration, supervision, delegation, and evaluation of nursing practice. A professional nurse may perform additional acts in the extended role requiring special education and training which are agreed to jointly by both the Board of Nursing and the Board of Medical Examiners. Those additional acts agreed to by both boards must be promulgated by the Board of Nursing in its regulations.

S.C.Code Ann. § 40–33–10(g) (2001).

Reading these statutory provisions and regulations together, we find the General Assembly has authorized a nurse practitioner to diagnose and treat medical conditions if a supervising physician has delegated those acts pursuant to an approved written protocol. Significantly, these provisions expand the role of a nurse practitioner to provide a medical diagnosis in addition to a nursing diagnosis. *See* S.C.Code Ann. § 40–33–10(n) (2001) (defining "nursing diagnosis" as "a clinical judgment about an individual, family, or community which is derived through a nursing assessment"); *Flanagan v. Labe,* 547 Pa. 254, 690 A.2d 183 (1997) (recognizing distinction between a nursing diagnosis and medical diagnosis); *Id.* at 186 ("[A] nursing diagnosis identifies signs and symptoms to the extent necessary to carry out the nursing regime. It does not, however, make final conclusions about the identity and cause of the underlying disease."); *cf. Newbern v. State,* No. 02–C–01–9106–CR00143, 1992 WL 124459 at *3 (Tenn.Crim.App. June 10, 1992) (holding a nurse practitioner could testify as expert in rape trial given "a nurse practitioner, unlike the average nurse, can make diagnoses like a doctor and can prescribe non-narcotic medication").

Turning to the instant case, we must examine the record to see if there is any evidence supporting Smith's ability to conduct medical diagnoses of patients. Southern's attorney asked Smith to describe the duties of a nurse practitioner. She responded:

Nurse practitioners are performing delegated medical acts, and that is a collaborative agreement between the physician and the nurse practitioner as to what she can perform, what she feels comfortable in doing, what she's been educated to do, and what [the physician] feels comfortable delegating to her. So, it varies from one practice to another what services nurse practitioners performs [sic].

In addition to this testimony, we note Smith had diagnosed Crawford prior to the accident as having bursitis in his shoulder. She treated him and prescribed medication and physical therapy. From this testimony, the judge could reasonably infer that a physician had delegated to Smith the power to diagnose.

Crawford, however, asserts that because the requisite "written protocol" was not offered into evidence by Southern it was error to permit Smith to testify regarding causation. We find this argument is not preserved for our review. First, it was not presented to the trial judge when Crawford objected to Smith's testimony. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."); *see also State v. Bailey*, 298 S.C. 1, 5–6, 377 S.E.2d 581, 584 (1989) (stating a party may not argue one ground at trial and then an alternative ground on appeal). Secondly, Crawford raised this specific argument for the first time in his reply brief. *See Glasscock, Inc. v. United States Fidelity & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 692 (Ct.App.2001), *cert. denied* (July 10, 2002) (finding that appellant could not raise additional arguments in reply brief because it was not addressed in initial brief); *Lister v. NationsBank*, 329 S.C. 133, 153, 494 S.E.2d 449, 460 (Ct.App.1997) (stating a point raised for the first time in a reply brief will not be considered by appellate court). Accordingly, we find the judge did not abuse his discretion in permitting Smith to testify regarding her diagnosis of Crawford's injury.

In the future, we believe the party presenting a nurse practitioner as a witness should offer a copy of the "approved written protocol" into evidence in order to clarify the exact medical acts the physician delegated to the nurse practitioner.

## CONCLUSION

An attorney-client relationship is not created between a UIM carrier's attorney and the named defendant. In the absence of this relationship, a UIM carrier's attorney may not assert the attorney-client privilege to protect communications between he and the named insured. Even if an attorney-client privilege could be asserted, this privilege may be waived if the attorney fails to file for a motion for a protective order pursuant to Rule 30(j)(3) of the South Carolina Rules of Civil Procedure. Finally, a nurse practitioner may testify regarding causation if a physician has delegated the requisite medical acts to the nurse practitioner in "approved written protocol."

Accordingly, we reverse the court's decision quashing Crawford's motion to reconvene Henderson's deposition and remand the case for a new trial. We affirm the decision of the court permitting the nurse practitioner to testify regarding the cause of Crawford's injuries.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

ANDERSON and HUFF, JJ., concur.