704 S.E.2d 350

**Dorothy M. GRAVES, Appellant,**

v.

**HORRY–GEORGETOWN TECHNICAL COLLEGE, Respondent.**

**No. 4757.**

Court of Appeals of South Carolina.

Heard Oct. 10, 2010.

Decided Nov. 3, 2010.

Rehearing Denied Jan. 28, 2011.

2

Shannon Lee Felder, of Winnsboro, for Appellant.

Charles J. Boykin, of Columbia, for Respondent.

PER CURIAM.

After resigning from her position, Dorothy M. Graves filed suit against her former employer, Horry–Georgetown Technical College (the College), for constructive discharge, and the circuit court directed a verdict in favor of the College. Graves appeals, arguing the directed verdict was improper because the College committed "official acts" that precipitated her discharge and excused her from the requirement that she exhaust her administrative remedies before filing suit. We affirm.

## FACTS

In 1974, Graves began working for the College in its accounting department. In 1999, after working at various po-

sitions within that department, Graves was promoted to Procurement Manager. As Procurement Manager, Graves ensured the College's purchases complied with the state-issued Procurement Code and prepared a brochure to assist College employees in understanding the Procurement Code's requirements.

In 2004, the College hired Harold Hawley as Vice President of Business Affairs. According to Graves, in her first meeting with Hawley, she learned he wanted to replace her as Procurement Manager. Graves testified that over the course of approximately six months, Hawley attempted once to re-assign her to a different job and encouraged her on three other occasions to resign. Graves noticed that people stopped coming to her for procurement issues and instead "would try to go around [her]." By her final month at the College, Graves noticed "not a whole lot of procurement" came through her.

In February 2005, following Graves's refusal to approve payment for an item Hawley wanted approved, Hawley called her and two other employees of the College into his office. Graves testified that Hawley told her "he was tired of [her] and he was not going to put up with [her] anymore," that employees from the maintenance department to Graves's own department had complained about her, and that Hawley himself had been hired "to take care of" Graves. Graves testified Hawley stated her attitude, her personality, and her management style "stank." According to Graves, he stated: "It's three o'clock. You got [until] 3:15 to do something—uh—put yourself together." Following this meeting, Graves testified, she felt her life was in danger and "was just too fearful to be around him anymore." She submitted her resignation to the personnel department on February 23, 2005, with an effective date of March 11, 2005. The College promptly acknowledged in writing its receipt and acceptance of her resignation. At the time of her resignation, Graves had participated in the Teacher and Employee Retention Incentive Program (TERI)[1] for two years and nine months.

---

1. S.C.Code Ann. § 9–1–2210 (Supp.2009) (providing when an eligible state employee returns to work under TERI, her retirement benefits are held in trust and disbursed to her when she ceases working under

In conjunction with her resignation, on March 7, 2005, Graves completed a termination questionnaire provided by the College. Her responses to the questionnaire did not mention Hawley's repeated suggestions that she resign or any harassment. She noted she resigned because of her working conditions and for a "reason that would appear to be discriminatory on the basis of race, color, sex, religion, national origin, age, handicap, or abuse." However, she did not explain these answers.

After delivering her letter of resignation to the personnel office, Graves telephoned the College's president, Neyle Wilson. Graves testified that when she met with Wilson a couple of days later, she told him Hawley had stated Wilson wanted her resignation. She explained that she needed her job to meet her financial obligations and that she felt what had been done to her was wrong. Graves asked him for a list of the complaints the College had received about her. According to Graves, Wilson responded in a letter stating he had discovered no complaints about her. Graves then asked Wilson to talk to the area commissioner, but he refused the request.

Graves initially filed suit in the United States District Court for the District of South Carolina. Her suit was assigned to a federal magistrate, who recommended granting the College's motion for summary judgment. On September 28, 2007, the federal court entered summary judgment in favor of the College as to Graves's claims under the Older Workers' Benefit Protection Act and the Equal Pay Act, then remanded the case to South Carolina's judicial system for determination of the constructive discharge claim.

The Court of Common Pleas for Horry County heard this matter on April 23, 2008. At the close of Graves's case, the College moved for a directed verdict based upon Graves's failure to prove the College intentionally caused her working conditions to be intolerable. The College also argued the circuit court should direct a verdict in its favor because Graves failed to avail herself of the grievance process either before or after resigning. According to the College, Graves failed to put

TERI; limiting TERI participation to a maximum of five years; and explaining TERI participation does not operate as a guarantee of employment).

forth evidence that the College intentionally caused her working conditions to be intolerable. Furthermore, the College argued Graves effectively waived her right to a judicial determination by failing to pursue her administrative remedies. On the other hand, Graves argued that, because she was forced to resign, the grievance process was not available to her, and her only recourse was to file an action for constructive discharge. Ultimately, the circuit court granted the College's motion. This appeal followed.

## STANDARD OF REVIEW

An appellate court will reverse the trial court's grant of a directed verdict when any evidence supports the party opposing the directed verdict. *Milhouse v. Food Lion, Inc.,* 289 S.C. 203, 203, 345 S.E.2d 739, 739 (Ct.App.1986). The appellate court must determine "whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his [or her] favor." *Erickson v. Jones St. Publishers, L.L.C.,* 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006). "When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence." *Id.*

## LAW/ANALYSIS

Graves asserts the trial court erred in directing a verdict in favor of the College on the ground that she failed to exhaust her administrative remedies. We disagree.

In ruling on motions for directed verdict, "the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions and to deny the motions whe[n] either the evidence yields more than one inference or its inference is in doubt." *Law v. S.C. Dep't of Corr.,* 368 S.C. 424, 434, 629 S.E.2d 642, 648 (2006). When either the evidence yields more than one inference or its inference is in doubt, the trial court should deny the motions. *McMillan v. Oconee Mem'l Hosp., Inc.,* 367 S.C. 559, 564, 626 S.E.2d 884, 886 (2006). "However, this rule does not authorize submission of speculative, theoretical, or hypothetical views to the jury."

*Proctor v. Dep't of Health & Envtl. Control,* 368 S.C. 279, 292–93, 628 S.E.2d 496, 503 (Ct.App.2006). In essence, the trial court must determine whether a verdict for the opposing party "would be reasonably possible under the facts as liberally construed in his [or her] favor." *Id.* at 293, 628 S.E.2d at 503 (quoting *Harvey v. Strickland,* 350 S.C. 303, 309, 566 S.E.2d 529, 532 (2002)).

## I. The Two Issue Rule

■ The College contends the two issue rule requires us to affirm the trial court because Graves failed to appeal the issue of whether working conditions at the College were so intolerable that a reasonable person would have been forced to resign. In support, the College states it argued in favor of a directed verdict not only because Graves failed to exhaust her administrative remedies, but also because Graves failed to prove the elements of constructive discharge. The College argues this court must affirm because although both bases for a directed verdict were before the trial court, Graves appealed only the exhaustion of administrative remedies.

■ "Under the two issue rule, where a decision is based on more than one ground, the appellate court will affirm unless the appellant appeals all grounds because the unappealed ground will become the law of the case." *Jones v. Lott,* 387 S.C. 339, 346, 692 S.E.2d 900, 903 (2010). Here, the record reveals little about the basis for the trial court's decision. Although the trial court briefly entertained arguments on the substantive issue, the principal discussion related to whether Graves had exhausted her administrative remedies. In any event, the basis for his ruling was largely unilluminating. In mentioning a possible relationship between the Tort Claims Act and the State Grievance Procedure,[2] the trial court noted: "it seems to me that there is some comparison in terms of policy ... that the [S]tate ... limits the ... type of actions that may be filed against the [S]tate ... by statute." The trial court's Form 4 order directing a verdict in favor of the College stated no basis for the ruling.

---

2. S.C.Code Ann. §§ 8–17–310 to –380 (1986 & Supp.2009).

In view of the arguments presented, the lengthy discussion regarding exhaustion of remedies, and the trial court's explanations, we find the trial court based its ruling upon procedure and did not evaluate the sufficiency of the evidence Graves presented regarding whether her working conditions were intolerable. The reference to statutory limitations upon the types of actions that individuals may bring against the State suggests the trial court agreed that Graves's failure to exhaust her administrative remedies precluded her from filing suit. It does not suggest that the trial court considered whether Graves bore her burden of proof. Consequently, the two issue rule does not apply, and we proceed to the merits of Graves's argument.

## II. Federal Requirement to Exhaust Administrative Remedies

We affirm the trial court's conclusion that federal law requires an employee in Graves's situation to exhaust the administrative remedies available to her. Title VII of the Civil Rights Act of 1964 prohibits the discharge of an employee on the basis of her "race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e–2(a)(1) (2003). Actions arising under Title VII for a hostile work environment fall into one of two categories: "(1) harassment that culminates in a tangible employment action, for which employers are strictly liable, and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense." *Penn. State Police v. Suders,* 542 U.S. 129, 143, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (internal quotation marks and citations omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

In the absence of a tangible employment action, an employee is entitled to relief for a constructive discharge if her "employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." *Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 186 (4th

Cir.2004) (internal quotation marks and citation omitted). The employee must prove that the employer's actions were deliberate and motivated by an unlawful bias (such as race) and that the working conditions were objectively intolerable.[3] *Id.* at 186–87. When an employer answers a claim of vicarious liability for harassment by a supervisor, it may defeat the claim by establishing the affirmative defense that it "exercised reasonable care to prevent and correct" the supervisor's harassing behavior and that the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Suders,* 542 U.S. at 145–46, 124 S.Ct. 2342 (internal quotation marks omitted).

▇▇ Graves's argument that she was not required to exhaust her administrative remedies because official acts by the College precipitated her departure is not properly before us. Her brief indicates that she intends "official acts" to mean "tangible employment action" as discussed in *Ellerth* and *Suders.* However, a party may not present one argument to the trial court and another on appeal. *Crawford v. Henderson,* 356 S.C. 389, 409, 589 S.E.2d 204, 215 (Ct.App. 2003); *see also Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."). Graves had ample opportunity to present her official acts argument to the trial court but failed to do so. Instead, she averred that there was "no controlling . . . case law . . . in these circumstances." She theorized that she was entitled to recover because her voluntary resignation excluded her from pursuing administrative remedies under the College's employee grievance procedure (EGP). In support, she

---

3. However, the federal courts caution that while an employee must not be subjected to unreasonably harsh working conditions designed to secure his resignation, the law does not guarantee him a working environment free of stress or frustration. *Goldsmith v. Mayor & City Council of Baltimore,* 987 F.2d 1064, 1072 (4th Cir.1993). Furthermore, recognizing that "the claim of constructive discharge is . . . open to abuse by those who leave employment of their own accord," the Fourth Circuit carefully limits its application. *Paroline v. Unisys Corp.,* 879 F.2d 100, 114 (4th Cir.1989) (Wilkinson, J., dissenting), *cited with approval in Paroline v. Unisys Corp.,* 900 F.2d 27, 28 (4th Cir.1990).

argued *Honor* entitled her to recover because she resigned after her employer made her working conditions intolerable. In her arguments to the trial court, she did not identify the significance of tangible employment action or its impact upon the employer's right to assert an affirmative defense. Consequently, her argument is not properly preserved, and we affirm the trial court's determination that federal law required Graves to exhaust her administrative remedies prior to filing suit.

### III. Administrative Remedies Available under State Law

 We turn next to the administrative remedies available to Graves. The General Assembly codified a grievance procedure for employees of the State "for the protection and in the interests of both the employee and the agency via a neutral method of dispute resolution and fair administrative review." S.C.Code Ann. § 8–17–310 (Supp.2009). In accordance with these statutes, each state government agency is required to have a written employee grievance procedure approved by the Office of Human Resources. S.C.Code Ann. § 8–17–330 (Supp.2009). The College's EGP mirrors the statutory requirements. This procedure defines termination of employment as "the action taken against an employee to separate the employee involuntarily from employment." Cf. S.C.Code Ann. § 8–17–320(26) (Supp.2009). Both the statute and the EGP specify that termination is a grievable event. § 8–17–330. However, according to the EGP, an employee who voluntarily resigns "shall waive any and all rights to file a grievance or an appeal concerning such actions."

The EGP outlines a formal employee grievance procedure consisting of four steps and culminating in review by the State Human Resources Director.[4] The EGP specifies that these steps are available only to covered employees, a group which

---

4. The EGP also provides an informal complaint process which permits an employee to file a written complaint with the Assistant Vice President for Human Resources and Employee Relations. It is unclear whether this process was available to employees who were not covered by the EGP. Furthermore, there is no indication pursuing such a complaint could have resulted in a judicially reviewable final agency decision.

excludes "returning retirees." Under this definition, Graves would not have qualified as a covered employee because she worked at the College under the TERI program as a retiree who returned to work for a maximum of five years. *See* S.C.Code Ann. § 9–1–2210 (Supp.2009) (outlining a retired employee's return to work under the TERI program). However, the version of the EGP in the record was last revised February 14, 2007, nearly two years after Graves left the College and state law on TERI employees' grievance rights changed. The record does not reflect whether the version of the EGP in effect in February 2005 excluded returning retirees or TERI employees from filing formal grievances. Consequently, we look not to the 2007 EGP but to the statutes in effect in February 2005 to determine whether Graves had grievance rights.

In February 2005 when Graves resigned, TERI employees were not statutorily excluded from using the State's employee grievance procedures. S.C.Code Ann. § 8–17–370 (Supp. 2004); *see also* S.C.Code Ann. § 9–1–2210(E) (Supp.2004) ("For employment purposes, a [TERI] participant is considered to be an active employee, retaining all other rights and benefits of an active employee"). The bar to TERI employees' use of those procedures was implemented on July 1, 2005, more than four months after Graves tendered her resignation. S.C.Code Ann. § 8–17–370(17) (Supp.2009) (exclusion of TERI employees originally effective July 1, 2005). Furthermore, in September 2004, our supreme court quoted a portion of the TERI guidelines for state government that specifically stated TERI employees had grievance rights at that time: "Employees who enter the TERI program gain no new employment rights and are subject to the employment policies and procedures associated with whatever position(s) they occupy during the program period, *to include those policies and procedures related to* salary, benefits, and *grievance rights." Med. Univ. of S.C. v. Arnaud,* 360 S.C. 615, 617 n. 1, 602 S.E.2d 747, 748 n. 1 (2004) (quotation marks omitted; emphasis supplied). Accordingly, we find that at the time she tendered her resignation, Graves was eligible to file a grievance.

Section 8–17–330 of the South Carolina Code (Supp.2004) required that each state government agency establish an employee grievance procedure. Each agency submitted its

procedure in writing to the State Office of Human Resources for approval and, once approved, provided a copy to each employee. *Id.* Section 8–17–320(7) of the South Carolina Code (Supp.2004) defined the term "covered employee" in a manner that did not exclude TERI employees. *Cf. Arnaud,* 360 S.C. at 617 n. 1, 602 S.E.2d at 748 n. 1. These state-mandated procedures were available to employees dissatisfied with "terminations, suspensions, involuntary reassignments, and demotions." § 8–17–330. Like the current statute, the 2004 version defined "termination" as "the action taken by an agency against an employee to separate the employee involuntarily from employment." § 8–17–320(26).

Each agency's procedure was required to incorporate a timetable prescribed by statute for timely resolution of employee grievances. § 8–17–330. The timetable required the employee to initiate her grievance "within fourteen calendar days of the effective date of the action" and the agency to issue its decision within forty-five days of the date the grievance was filed. *Id.* Within ten days of receiving the agency's decision, the employee could file a written appeal of the decision with the State Human Resources Director. *Id.* Failure to do so timely "constitute[d] a waiver of the right to appeal." *Id.*

The plain language in the definition of "termination" does not distinguish a forced resignation from a termination. Rather, we find "the action taken against an employee to separate [her] involuntarily from employment" contemplated intolerably oppressive or discriminatory behavior by a superior aimed at forcing the employee to resign. This language does not require the action to be official or sanctioned by the College President; it need only be directed toward the employee. By the same token, these terms do not refer to firing the employee, but rather to taking action against her to separate her from her job against her will.

Although the trial court made no specific findings, it heard extensive arguments on the question of whether a forced resignation was a type of termination. The trial court's ultimate ruling required an implicit finding that a forced resignation amounted to a grievable termination. The trial court observed two possible outcomes. On one hand, if Graves

were ineligible to grieve her separation from the College, she had the right to pursue her claim in court. If, on the other hand, Graves was required to but failed to file a grievance, she effectively waived her right to seek relief in court.

The record supports a finding that Graves failed to avail herself of her grievance rights by failing to submit a written grievance within the applicable time limit. In addition, the trial court reviewed Graves's exit questionnaire, which did not indicate she felt .pressured to resign. In that document, Graves indicated she left for a reason "that would appear to be discriminatory on the basis of race, color, sex, religion, national origin, age, handicap or Vietnam Era Veteran." Nonetheless, she made no effort to explain her reason for leaving, either on the questionnaire or in her letter of resignation. Graves testified that she did not report Hawley's behavior before she resigned but that the College knew her reasons for leaving because she "told Mr. Wilson." However, Graves did not speak with Wilson until a couple of days after she resigned. When she did speak with him, she did not ask him to reinstate her employment or correct the wrongs done to her.[5] Instead, she confronted him about Hawley's intent to force her out and asked him to provide her with the names of the people who had complained about her. After receiving Wilson's letter of response to this request, Graves sent Wilson a letter asking him to talk to the area commissioner, but Wilson declined. Consequently, the record supports a finding that Graves failed to pursue her grievance rights prior to filing suit, and the trial court did not err in directing a verdict in the College's favor.

## CONCLUSION

We find federal law did not excuse Graves from exhausting her administrative remedies before filing suit. Furthermore, we find that at the time of Graves's resignation, she had a statutory right to pursue her grievance under the State Employee Grievance Procedure. She failed to do so before filing

---

5. During oral argument, counsel for the College conceded that if Graves had requested reinstatement in writing and the College had refused, she could have grieved the College's failure to reinstate.

suit. Accordingly, we affirm the trial court's grant of a directed verdict in favor of the College.

**AFFIRMED.**

HUFF and GEATHERS, JJ., and CURETON, A.J., concur.