## NATIONAL LABOR RELATIONS BOARD v. EAST TEXAS MOTOR FREIGHT LINES.

### No. 10712.

Circuit Court of Appeals, Fifth Circuit.

Feb. 3, 1944.

Rehearing Denied April 11, 1944.

Robert B. Watts, Gen. Counsel, and Ernest A. Gross, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and Earle K. Shawe, Regional Atty., National Labor Relations Board, of Baltimore, Md., for petitioner.

Carl B. Callaway, of Dallas, Tex. for respondent.

Before HUTCHESON, McCORD, and LEE, Circuit Judges.

McCORD, Circuit Judge.

National Labor Relations Board petitions for enforcement of its order issued against East Texas Motor Freight Lines, pursuant to Section 10 (c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Local No. 47, affiliated with American Federation of Labor, complained to the Board that East Texas Motor Freight Lines had been guilty of unfair labor practices. After a hearing, the Board found the charges against Motor Lines to be true, and is here seeking to have its order enforced.

East Texas Motor Freight Lines is a Texas corporation, having its principal office in Dallas, Texas, and is engaged in transporting and delivering goods, wares, merchandise and general commodities by motor vehicles in many States.

It is without dispute that East Texas Motor Freight Lines was engaged in interstate commerce, and no question is raised as to jurisdiction.

The important facts are these: In June 1942, Motor Lines had four truck drivers in its employ at its terminal in Fort Worth, Texas; they each signed application for

membership in the union, and thereafter a representative of the union telephoned from Fort Worth to the president of Motor Lines at Dallas that he desired to negotiate a contract on behalf of these men. The president informed him that he was about to undertake a business trip and promised to communicate with the union on his return. Before departing on his trip the president instructed the manager of the Motor Lines terminal at Fort Worth to ascertain whether the drivers there had become members of the union, but cautioned him not to criticize them if they had. The manager went entirely beyond the instructions and on the afternoon of June 23, 1942, at the close of working hours, met all four drivers at the loading dock at Fort Worth and inquired of each of them if they belonged to the union, and when they admitted that they did, he then asked them if they cared to withdraw their applications and they said they did not. He then told all of them that so far as the Motor Lines was concerned it didn't make any difference one way or the other, whether they were union or nonunion men. "Well, I told all of them that I had lost confidence in them, the confidence that I had had before, because they had gone and done things that would affect their jobs without consulting me, and without talking the thing over with me. * * * Well, I had the personal feeling that there I was being let down, so to speak. It was purely a personal matter between these men and myself, because we had been close together there, close friends, and I felt they should come and talk to me about those things, or anything that would pertain to their jobs one way or the other."

On the evening of June 23, 1942, the manager went into a cafe where Hill and Slate, two of the employees, were sitting, and asked to speak to Slate. Both testified that the manager expressed the opinion that it would be best for them to resign, and Hill testified that the manager stated, "it was the only decent thing or white thing—I believe was the way he put it— we could do." Both Hill and Slate went to Motor Lines' offices the following morning and resigned. Three of the drivers, Hill, Slate and Tranthall, resigned their positions after their interview with Wyatt, the manager. Pickering, the fourth driver, testified that on June 25, and after the other three drivers had resigned, Wyatt, the manager, suggested to Pickering, without any request by Pickering, that he take the

following day off to look for another position. Touching this conversation, Wyatt testified: "I told Mr. Pickering that I had lost confidence in him because he hadn't discussed these things with me, that I didn't have the confidence in him that I had before and I felt that if he would do one thing and not tell me about it he would probably do other things and I would have to watch him and stay right behind him all the time, and that is the way I felt about it. * * * I remember some parts of that conversation: Mr. Pickering asked me what I would do if I were in his place, and I said, 'Gordon, under the circumstances, if I were in your place I would look around for another job, because I don't have the confidence in you, and I wouldn't want to work for a man that didn't have confidence in me.'" Pickering resigned the same day.

■ It was clearly within the rights of Motor Lines, through its manager, to ascertain whether its employees had organized a union; it was further within the rights of such officer to express his individual views with reference to unions and his opinions of unions with any of the employees, as this involved freedom of speech, but when he went beyond this and sought to influence or intimidate employees, as did Wyatt, it was clearly in violation of the National Labor Relations Act. Moreover, the signed statements secured from Pickering and Slate by the manager after they had left Motor Lines, which was to the effect that they had voluntarily resigned, does not register as against the solemn evidence that they had left the service of Motor Lines because of Wyatt's attitude and advice to them to quit because they had made application to join the union. The further reason that they did not seek or want reemployment or back pay does not purge Motor Lines of its unfair practices.

■ Although Wyatt, the Motor Lines' manager at Fort Worth, went beyond and contrary to the orders of its president, this cannot absolve it from the rigors of this Act. He was the representative of Motor Lines, and while acting directly within the line and scope of his employment clearly violated the inhibitions of the National Labor Relations Act. Solvay Process Company v. N. L. R. B., 5 Cir., 117 F.2d 83, 85.

■ The uncontradicted statements of Wyatt to the four employees that he had lost confidence in them, that it would be

best for them to quit and seek other employment, as many ways and causes could be found to discharge them, clearly measured to illegal interference. International Association of Machinists, Tool and Die Makers Lodge No. 35 v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; Heinz Company v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; N. L. R. B. v. Kohen-Ligon-Folz, Inc., 5 Cir., 128 F.2d 502; Shell Oil Company v. N. L. R. B., 5 Cir., 128 F.2d 206.

The Board ordered Motor Lines to cease and desist from discouraging membership in International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 47, or in any other labor organization by discriminating in regard to the hire and tenure of employment of its employees because of their union membership or activity; in any other manner interfering with, restraining, or coercing its employees in the exercise of the right of self-organization to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or mutual aid or protection, as guaranteed by the Act; to post notices, etc.

There was substantial evidence to warrant the Board in its findings and conclusions.

Petition for enforcement is granted.