# PENNSYLVANIA STATE POLICE *v.* SUDERS

No. 03–95.   Argued March 31, 2004—Decided June 14, 2004

130

*John G. Knorr III*, Chief Deputy Attorney General of Pennsylvania, argued the cause for petitioner. With him on the briefs were *Gerald J. Pappert*, Acting Attorney General, and *Howard G. Hopkirk* and *Sarah C. Yerger*, Deputy Attorneys General.

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney Gen-*

eral *Acosta,* Deputy Solicitor General *Clement,* Eric S. *Dreiband,* and *Lorraine C. Davis.*

*Donald A. Bailey* argued the cause and filed a brief for respondent.*

JUSTICE GINSBURG delivered the opinion of the Court.

Plaintiff-respondent Nancy Drew Suders alleged sexually harassing conduct by her supervisors, officers of the Pennsylvania State Police (PSP), of such severity she was forced to resign. The question presented concerns the proof burdens parties bear when a sexual harassment/constructive discharge claim of that character is asserted under Title VII of the Civil Rights Act of 1964.

To establish hostile work environment, plaintiffs like Suders must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [their] employment." *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 67 (1986) (internal quotation marks omitted); see *Harris* v. *Forklift Systems, Inc.,* 510 U. S. 17, 22 (1993) ("[T]he very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employ-

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Peter Buscemi, Harry A. Rissetto, Stephen A. Bokat,* and *Robin S. Conrad;* for the Equal Employment Advisory Council by *Ann Elizabeth Reesman* and *Katherine Y. K. Cheung;* and for the Society for Human Resource Management by *Allan H. Weitzman, Sarah A. Mindes, Edward Cerasia II, Lawrence Z. Lorber,* and *Paul Salvatore.*

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, James B. Coppess,* and *Laurence Gold;* and for the Lawyers' Committee for Civil Rights Under Law et al. by *Barbara R. Arnwine, Thomas J. Henderson, Michael L. Foreman, Sarah C. Crawford, Audrey Wiggins, Susan Grover, Patricia Roberts, Daniel B. Kohrman, Laurie A. McCann, Thomas Osborne, Melvin Radowitz, Steven R. Shapiro, Lenora M. Lapidus, Patricia A. Shiu, Claudia Center, Dennis C. Hayes, Vincent A. Eng, Judith L. Lichtman, Jocelyn C. Frye, Dina R. Lassow,* and *Jennifer K. Brown.*

ees because of their . . . gender . . . offends Title VII's broad rule of workplace equality."). Beyond that, we hold, to establish "constructive discharge," the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response. An employer may defend against such a claim by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus. This affirmative defense will not be available to the employer, however, if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions. In so ruling today, we follow the path marked by our 1998 decisions in *Burlington Industries, Inc.* v. *Ellerth,* 524 U. S. 742, and *Faragher* v. *Boca Raton,* 524 U. S. 775.

I

Because this case was decided against Suders in the District Court on the PSP's motion for summary judgment, we recite the facts, as summarized by the Court of Appeals, in the light most favorable to Suders.[1] In March 1998, the PSP hired Suders as a police communications operator for the McConnellsburg barracks. *Suders* v. *Easton,* 325 F. 3d 432, 436 (CA3 2003). Suders' supervisors were Sergeant Eric D. Easton, Station Commander at the McConnellsburg barracks, Patrol Corporal William D. Baker, and Corporal Eric B. Prendergast. *Ibid.* Those three supervisors subjected

---

[1] The PSP, we note, "vigorously dispute[s]" the truth of Suders' allegations, contending that some of the incidents she describes "never happened at all," while "others took place in a context quite different from that suggested by [Suders]." Brief for Petitioner 4, n. 3.

Suders to a continuous barrage of sexual harassment that ceased only when she resigned from the force. *Ibid.*

Easton "would bring up [the subject of] people having sex with animals" each time Suders entered his office. *Ibid.* (internal quotation marks omitted). He told Prendergast, in front of Suders, that young girls should be given instruction in how to gratify men with oral sex. *Ibid.* Easton also would sit down near Suders, wearing spandex shorts, and spread his legs apart. *Ibid.* Apparently imitating a move popularized by television wrestling, Baker repeatedly made an obscene gesture in Suders' presence by grabbing his genitals and shouting out a vulgar comment inviting oral sex. *Id.*, at 437. Baker made this gesture as many as five-to-ten times per night throughout Suders' employment at the barracks. *Ibid.* Suders once told Baker she " 'd[id]n't think [he] should be doing this' "; Baker responded by jumping on a chair and again performing the gesture, with the accompanying vulgarity. *Ibid.* Further, Baker would "rub his rear end in front of her and remark 'I have a nice ass, don't I?' " *Ibid.* Prendergast told Suders " 'the village idiot could do her job' "; wearing black gloves, he would pound on furniture to intimidate her. *Ibid.*[2]

In June 1998, Prendergast accused Suders of taking a missing accident file home with her. *Id.*, at 438. After that incident, Suders approached the PSP's Equal Employment Opportunity Officer, Virginia Smith-Elliott, and told her she "might need some help." *Ibid.* Smith-Elliott gave Suders her telephone number, but neither woman followed up on the conversation. *Ibid.* On August 18, 1998, Suders contacted Smith-Elliott again, this time stating that she was being harassed and was afraid. *Ibid.* Smith-Elliott told Suders to

---

[2] In addition, the supervisors made derogatory remarks about Suders' age, *e. g.*, stating " 'a 25-year-old could catch on faster' " than she could, 325 F. 3d, at 436, and calling her " 'momma,' " *id.*, at 437. They further harassed her for having political influence. *Ibid.* Suders' age and political-affiliation discrimination claims are not before us.

file a complaint, but did not tell her how to obtain the necessary form. Smith-Elliott's response and the manner in which it was conveyed appeared to Suders insensitive and unhelpful. *Ibid.*

Two days later, Suders' supervisors arrested her for theft, and Suders resigned from the force. The theft arrest occurred in the following circumstances. Suders had several times taken a computer-skills exam to satisfy a PSP job requirement. *Id.*, at 438–439. Each time, Suders' supervisors told her that she had failed. *Id.*, at 439. Suders one day came upon her exams in a set of drawers in the women's locker room. She concluded that her supervisors had never forwarded the tests for grading and that their reports of her failures were false. *Ibid.* Regarding the tests as her property, Suders removed them from the locker room. *Ibid.*; App. 11, 119–120. Upon finding that the exams had been removed, Suders' supervisors devised a plan to arrest her for theft. 325 F. 3d, at 438–439. The officers dusted the drawer in which the exams had been stored with a theft-detection powder that turns hands blue when touched. *Id.*, at 439. As anticipated by Easton, Baker, and Prendergast, Suders attempted to return the tests to the drawer, whereupon her hands turned telltale blue. *Ibid.* The supervisors then apprehended and handcuffed her, photographed her blue hands, and commenced to question her. *Ibid.* Suders had previously prepared a written resignation, which she tendered soon after the supervisors detained her. *Ibid.* Nevertheless, the supervisors initially refused to release her. Instead, they brought her to an interrogation room, gave her warnings under *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and continued to question her. 325 F. 3d, at 439. Suders reiterated that she wanted to resign, and Easton then let her leave. *Ibid.* The PSP never brought theft charges against her.

In September 2000, Suders sued the PSP in Federal District Court, alleging, *inter alia*, that she had been subjected

to sexual harassment and constructively discharged, in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U. S. C. § 2000e *et seq.* App. 1, 12–13.[3] At the close of discovery, the District Court granted the PSP's motion for summary judgment. Suders' testimony, the District Court recognized, sufficed to permit a trier of fact to conclude that the supervisors had created a hostile work environment. App. to Pet. for Cert. 76a. The court nevertheless held that the PSP was not vicariously liable for the supervisors' conduct. *Id.*, at 80a.

In so concluding, the District Court referred to our 1998 decision in *Faragher* v. *Boca Raton,* 524 U. S. 775. See App. to Pet. for Cert. 77a–78a. In *Faragher,* along with *Burlington Industries, Inc.* v. *Ellerth,* 524 U. S. 742, decided the same day, the Court distinguished between supervisor harassment unaccompanied by an adverse official act and supervisor harassment attended by "a tangible employment action." *Id.*, at 765; accord *Faragher,* 524 U. S., at 808. Both decisions hold that an employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth,* 524 U. S., at 765; accord *Faragher,* 524 U. S., at 808. But when no tangible employment action is taken, both decisions also hold, the employer may raise an affirmative defense to liability, subject to proof by a preponderance of the evidence: "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably

---

[3] Suders raised several other claims that are not at issue here, including claims under the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, 29 U. S. C. § 621 *et seq.*, and the Pennsylvania Human Relations Act (PHRA), Pa. Stat. Ann., Tit. 43, § 951 *et seq.* (Purdon 1991). App. 7. She also asserted claims against Easton, Baker, Prendergast, and Smith-Elliott in their individual capacities under Title VII, the ADEA, and the PHRA. App. to Pet. for Cert. 70a–73a.

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U. S., at 765; accord *Faragher*, 524 U. S., at 807.

Suders' hostile work environment claim was untenable as a matter of law, the District Court stated, because she "unreasonably failed to avail herself of the PSP's internal procedures for reporting any harassment." App. to Pet. for Cert. 80a. Resigning just two days after she first mentioned anything about harassment to Equal Employment Opportunity Officer Smith-Elliott, the court noted, Suders had "never given [the PSP] the opportunity to respond to [her] complaints." *Ibid.* The District Court did not address Suders' constructive discharge claim.[4]

The Court of Appeals for the Third Circuit reversed and remanded the case for disposition on the merits. 325 F. 3d, at 462. The Third Circuit agreed with the District Court that Suders had presented evidence sufficient for a trier of fact to conclude that the supervisors had engaged in a "pattern of sexual harassment that was pervasive and regular." *Id.*, at 442. But the appeals court disagreed with the District Court in two fundamental respects. First, the Court of Appeals held that, even assuming the PSP could assert the affirmative defense described in *Ellerth* and *Faragher*,

---

[4] The District Court disposed of all other claims in the PSP's favor. The court granted the PSP summary judgment on Suders' Title VII retaliation claim, observing that Suders did not engage in any protected activity, *e. g.*, she did not file a discrimination claim, prior to her resignation. *Id.*, at 80a–81a. It dismissed Suders' ADEA and PHRA claims against the PSP on sovereign immunity grounds, *id.*, at 72a–73a, and her Title VII and ADEA claims against the individual defendants on the ground that those statutes do not provide for individual liability, *id.*, at 70a–72a. The court also dismissed the PHRA claims against the individual defendants because Suders had failed to respond to the defendants' assertions of immunity. *Id.*, at 73a–74a. Suders did not raise any of the above claims on appeal. See Brief for Appellant in No. 01–3512 (CA3), p. 2; Brief for Appellees in No. 01–3512, p. 4.

genuine issues of material fact existed concerning the effectiveness of the PSP's "program . . . to address sexual harassment claims." 325 F. 3d, at 443. Second, the appeals court held that the District Court erred in failing to recognize that Suders had stated a claim of constructive discharge due to the hostile work environment. *Ibid.*[5]

A plaintiff alleging constructive discharge in violation of Title VII, the Court of Appeals stated, must establish:

"(1) he or she suffered harassment or discrimination so intolerable that a reasonable person in the same position would have felt compelled to resign . . . ; and (2) the employee's reaction to the workplace situation—that is, his or her decision to resign—was reasonable given the totality of circumstances . . . ." *Id.*, at 445.

Viewing the complaint in that context, the court determined that Suders had raised genuine issues of material fact relating to her claim of constructive discharge. *Id.*, at 446.

The Court of Appeals then made the ruling challenged here: It held that "a constructive discharge, when proved, constitutes a tangible employment action." *Id.*, at 447. Under *Ellerth* and *Faragher*, the court observed, such an action renders an employer strictly liable and precludes employer recourse to the affirmative defense announced in those decisions. 325 F. 3d, at 447. The Third Circuit recognized that the Courts of Appeals for the Second and Sixth Circuits had ruled otherwise. A constructive discharge resulting from a supervisor-created hostile work environment, both Circuits had held, does not qualify as a tangible employment action, and therefore does not stop an employer from

---

[5] Although Suders' complaint did not expressly mention constructive discharge, the Third Circuit found "[t]he allegations of constructive discharge . . . apparent on the face of Suders's [pleading]." 325 F. 3d, at 443; see *ibid.* ("In the very first paragraph, Suders alleged that she was 'forced to suffer a termination of employment because she would not yield to sexual suggestions [and] innuendoes . . . .'" (quoting Introductory Statement to Suders' complaint, reprinted in this Court at App. 6)).

invoking the *Ellerth/Faragher* affirmative defense. 325 F. 3d, at 452–453 (citing *Caridad* v. *Metro-North Commuter R. Co.*, 191 F. 3d 283, 294 (CA2 1999), and *Turner* v. *Dowbrands, Inc.*, No. 99–3984, 2000 WL 924599, *1 (CA6, June 26, 2000) (unpublished)). The Third Circuit, however, reasoned that a constructive discharge "'constitutes a significant change in employment status' by ending the employer-employee relationship" and "also inflicts the same type of 'direct economic harm'" as the tangible employment actions *Ellerth* and *Faragher* offered by way of example (discharge, demotion, undesirable reassignment). 325 F. 3d, at 460 (quoting *Ellerth*, 524 U. S., at 761, 762). Satisfied that Suders had "raised genuine issues of material fact as to her claim of constructive discharge," and that the PSP was "precluded from asserting the affirmative defense to liability advanced in support of its motion for summary judgment," the Court of Appeals remanded Suders' Title VII claim for trial. 325 F. 3d, at 461.

This Court granted certiorari, 540 U. S. 1046 (2003), to resolve the disagreement among the Circuits on the question whether a constructive discharge brought about by supervisor harassment ranks as a tangible employment action and therefore precludes assertion of the affirmative defense articulated in *Ellerth* and *Faragher*. Compare 325 F. 3d, at 461 (constructive discharge qualifies as a tangible employment action); *Jaros* v. *LodgeNet Entertainment Corp.*, 294 F. 3d 960, 966 (CA8 2002) (same), with *Caridad*, 191 F. 3d, at 294 (constructive discharge does not qualify as a tangible employment action); *Turner*, 2000 WL 924599, *1 (same), and *Reed* v. *MBNA Marketing Systems, Inc.*, 333 F. 3d 27, 33 (CA1 2003) (constructive discharge qualifies as a tangible employment action only when effected through a supervisor's official act); *Robinson* v. *Sappington*, 351 F. 3d 317, 336 (CA7 2003) (same). We conclude that an employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive

discharge; absent such a "tangible employment action," however, the defense is available to the employer whose supervisors are charged with harassment. We therefore vacate the Third Circuit's judgment and remand the case for further proceedings.

II

A

Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 838–839 (3d ed. 1996) (hereinafter Lindemann & Grossman). The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign? See C. Weirich et al., 2002 Cumulative Supplement to Lindemann & Grossman 651–652, and n. 1 (collecting cases) (hereinafter Weirich).

The constructive discharge concept originated in the labor-law field in the 1930's; the National Labor Relations Board (NLRB) developed the doctrine to address situations in which employers coerced employees to resign, often by creating intolerable working conditions, in retaliation for employees' engagement in collective activities. Lieb, Constructive Discharge Under Section 8(a)(3) of the National Labor Relations Act: A Study in Undue Concern Over Motives, 7 Indus. Rel. L. J. 143, 146–148 (1985); see *In re Sterling Corset Co.*, 9 N. L. R. B. 858, 865 (1938) (first case to use term "constructive discharg[e]"). Over the next two decades, Courts of Appeals sustained NLRB constructive discharge rulings. See, *e. g.*, *NLRB* v. *East Texas Motor Freight Lines*, 140 F. 2d 404, 405 (CA5 1944) (first Circuit case to hold supervisor-caused resignation an unfair labor practice); *NLRB* v. *Saxe-Glassman Shoe Corp.*, 201 F. 2d 238, 243 (CA1 1953) (first Circuit case to allow backpay award for

constructive discharge). By 1964, the year Title VII was enacted, the doctrine was solidly established in the federal courts. See Comment, That's It, I Quit: Returning to First Principles in Constructive Discharge Doctrine, 23 Berkeley J. Emp. & Lab. L. 401, 410 (2002).

The Courts of Appeals have recognized constructive discharge claims in a wide range of Title VII cases. See, *e. g.*, *Robinson*, 351 F. 3d, at 336–337 (sexual harassment); *Moore* v. *KUKA Welding Systems & Robot Corp.*, 171 F. 3d 1073, 1080 (CA6 1999) (race); *Bergstrom-Ek* v. *Best Oil Co.*, 153 F. 3d 851, 858–859 (CA8 1998) (pregnancy); *Amirmokri* v. *Baltimore Gas & Elec. Co.*, 60 F. 3d 1126, 1132–1133 (CA4 1995) (national origin); *Derr* v. *Gulf Oil Corp.*, 796 F. 2d 340, 343 (CA10 1986) (sex); *Young* v. *Southwestern Sav. & Loan Assn.*, 509 F. 2d 140, 143–144 (CA5 1975) (religion). See also *Goss* v. *Exxon Office Systems Co.*, 747 F. 2d 885, 887 (CA3 1984) ("[A]pplication of the constructive discharge doctrine to Title VII cases has received apparently universal recognition among the courts of appeals which have addressed that issue."); 3 L. Larson, Labor and Employment Law § 59.05[8] (2003) (collecting cases). And the Equal Employment Opportunity Commission (EEOC), the federal agency charged with implementing Title VII, has stated: An employer "is responsible for a constructive discharge in the same manner that it is responsible for the outright discriminatory discharge of a charging party." 2 EEOC Compliance Manual §612.9(a) (2002).

Although this Court has not had occasion earlier to hold that a claim for constructive discharge lies under Title VII, we have recognized constructive discharge in the labor-law context, see *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883, 894 (1984) (NLRB may find employer engaged in unfair labor practice "when, for the purpose of discouraging union activity, . . . [the employer] creates working conditions so intolerable that the employee has no option but to resign—a so-called 'constructive discharge.'"). Furthermore, we have stated that

"Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment." *Ellerth*, 524 U. S., at 752. See also *Meritor Savings Bank, FSB* v. *Vinson*, 477 U. S., at 64 ("The phrase 'terms, conditions, or privileges of employment' [in Title VII] evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." (some internal quotation marks omitted)). We agree with the lower courts and the EEOC that Title VII encompasses employer liability for a constructive discharge.

## B

This case concerns an employer's liability for one subset of Title VII constructive discharge claims: constructive discharge resulting from sexual harassment, or "hostile work environment," attributable to a supervisor. Our starting point is the framework *Ellerth* and *Faragher* established to govern employer liability for sexual harassment by supervisors.[6] As earlier noted, see *supra*, at 137–138, those decisions delineate two categories of hostile work environment claims: (1) harassment that "culminates in a tangible employment action," for which employers are strictly liable, *Ellerth*, 524 U. S., at 765; accord *Faragher*, 524 U. S., at 808, and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense, *Ellerth*, 524 U. S., at 765; accord *Faragher*, 524 U. S., at 807. With the background set out above in mind, we turn to the key issues here at stake: Into which *Ellerth/Faragher* category do hostile-environment constructive discharge claims fall—and what proof burdens do the parties bear in such cases.

In *Ellerth* and *Faragher*, the plaintiffs-employees sought to hold their employers vicariously liable for sexual harassment by their supervisors, even though the plaintiffs "suf-

---

[6] *Ellerth* and *Faragher* expressed no view on the employer liability standard for co-worker harassment. Nor do we.

fer[ed] no adverse, tangible job consequences." *Ellerth*, 524 U. S., at 747. Setting out a framework for employer liability in those decisions, this Court noted that Title VII's definition of "employer" includes the employer's "agent[s]," 42 U. S. C. § 2000e(b). See *Ellerth*, 524 U. S., at 754. We viewed that definition as a direction to "interpret Title VII based on agency principles." *Ibid.* The Restatement (Second) of Agency (1957) (hereinafter Restatement), the Court noted, states (in its black-letter formulation) that an employer is liable for the acts of its agent when the agent "'was aided in accomplishing the tort by the existence of the agency relation.'" *Ellerth*, 524 U. S., at 758 (quoting Restatement § 219(2)(d)); accord *Faragher*, 524 U. S., at 801.

We then identified "a class of cases where, beyond question, more than the mere existence of the employment relation aids in commission of the harassment: when a supervisor takes a tangible employment action against the subordinate." *Ellerth*, 524 U. S., at 760. A tangible employment action, the Court explained, "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*, at 761. Unlike injuries that could equally be inflicted by a co-worker, we stated, tangible employment actions "fall within the special province of the supervisor," who "has been empowered by the company as . . . [an] agent to make economic decisions affecting other employees under his or her control." *Id.*, at 762. The tangible employment action, the Court elaborated, is, in essential character, "an official act of the enterprise, a company act." *Ibid.* It is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Ibid.* Often, the supervisor will "use [the company's] internal processes" and thereby "obtain the imprimatur of the enterprise." *Ibid.* Ordinarily, the tangible employment decision "is documented in official company records, and may be subject to review by

higher level supervisors." *Ibid.* In sum, we stated, "when a supervisor takes a tangible employment action against a subordinate[,] . . . it would be implausible to interpret agency principles to allow an employer to escape liability." *Id.*, at 762–763.

When a supervisor's harassment of a subordinate does not culminate in a tangible employment action, the Court next explained, it is "less obvious" that the agency relation is the driving force. *Id.*, at 763. We acknowledged that a supervisor's "power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation." *Ibid.* But we also recognized that "there are acts of harassment a supervisor might commit which might be the same acts a coemployee would commit, and there may be some circumstances where the supervisor's status [would] mak[e] little difference." *Ibid.*

An "aided-by-the-agency-relation" standard, the Court suggested, was insufficiently developed to press into service as the standard governing cases in which no tangible employment action is in the picture. Looking elsewhere for guidance, we focused on Title VII's design "to encourage the creation of antiharassment policies and effective grievance mechanisms." *Id.*, at 764. The Court reasoned that tying the liability standard to an employer's effort to install effective grievance procedures would advance Congress' purpose "to promote conciliation rather than litigation" of Title VII controversies. *Ibid.* At the same time, such linkage of liability limitation to effective preventive and corrective measures could serve Title VII's deterrent purpose by "encourag[ing] employees to report harassing conduct before it becomes severe or pervasive." *Ibid.* Accordingly, we held that when no tangible employment action is taken, the employer may defeat vicarious liability for supervisor harassment by establishing, as an affirmative defense, both that "the employer exercised reasonable care to prevent and cor-

rect promptly any sexually harassing behavior," and that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*, at 765; accord *Faragher,* 524 U. S., at 807.

*Ellerth* and *Faragher* also clarified the parties' respective proof burdens in hostile environment cases. Title VII, the Court noted, "borrows from tort law the avoidable consequences doctrine," *Ellerth,* 524 U. S., at 764, under which victims have "a duty 'to use such means as are reasonable under the circumstances to avoid or minimize the damages' that result from violations of the statute," *Faragher,* 524 U. S., at 806 (quoting *Ford Motor Co.* v. *EEOC,* 458 U. S. 219, 231, n. 15 (1982)). The *Ellerth/Faragher* affirmative defense accommodates that doctrine by requiring plaintiffs reasonably to stave off avoidable harm. But both decisions place the burden squarely on the defendant to prove that the plaintiff unreasonably failed to avoid or reduce harm. *Ellerth,* 524 U. S., at 765; accord *Faragher,* 524 U. S., at 807; cf. C. McCormick, Law of Damages 130 (1935) (defendant has burden of persuading factfinder "plaintiff could reasonably have reduced his loss or avoided injurious consequences").[7]

## 1

The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment. For an atmosphere of sexual harassment or hostility to be actionable, we reiterate, see *supra,* at 133–134, the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the vic-

---

[7] The employer is in the best position to know what remedial procedures it offers to employees and how those procedures operate. See 9 J. Wigmore, Evidence § 2486, p. 290 (J. Chadbourn rev. ed. 1981) ("[T]he burden of proving a fact is said to be put on the party who presumably has peculiar means of knowledge enabling him to prove its falsity if it is false." (emphasis deleted)).

tim's employment and create an abusive working environment." *Meritor*, 477 U. S., at 67 (internal quotation marks and brackets omitted). A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. See, *e. g.*, *Breeding* v. *Arthur J. Gallagher & Co.*, 164 F. 3d 1151, 1160 (CA8 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); *Perry* v. *Harris Chernin, Inc.*, 126 F. 3d 1010, 1015 (CA7 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").[8]

Suders' claim is of the same genre as the hostile work environment claims the Court analyzed in *Ellerth* and *Faragher*.[9] Essentially, Suders presents a "worse case" harassment sce-

---

[8] As earlier noted, see *supra*, at 141, a prevailing constructive discharge plaintiff is entitled to all damages available for formal discharge. The plaintiff may recover postresignation damages, including both backpay and, in fitting circumstances, frontpay, see 1 Lindemann & Grossman 838; Weirich 651, as well as the compensatory and punitive damages now provided for Title VII claims generally, see 42 U. S. C. § 1981a(a)(1); *Pollard* v. *E. I. du Pont de Nemours & Co.*, 532 U. S. 843, 848 (2001) (noting expanded remedies under Civil Rights Act of 1991).

[9] Both the *Ellerth* and *Faragher* plaintiffs resigned from their posts; plaintiff Ellerth expressly alleged constructive discharge. See *Burlington Industries, Inc.* v. *Ellerth*, 524 U. S. 742, 748–749 (1998); *Faragher* v. *Boca Raton*, 524 U. S. 775, 783 (1998). Although Ellerth's constructive discharge claim was not before this Court, the decision's omission of constructive discharge from its examples of tangible employment actions is conspicuous. See 524 U. S., at 761; Brief for Chamber of Commerce of the United States as *Amicus Curiae* 10 ("[T]his Court's omission of constructive discharge in its discussion of tangible employment actions was widely regarded as a purposeful one."). Tellingly, we stated that Ellerth "ha[d] not alleged she suffered a tangible employment action," despite the fact that her complaint alleged constructive discharge. 524 U. S., at 766.

nario, harassment ratcheted up to the breaking point. Like the harassment considered in our pathmarking decisions, harassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts. Unlike an actual termination, which is *always* effected through an official act of the company, a constructive discharge need not be. A constructive discharge involves both an employee's decision to leave and precipitating conduct: The former involves no official action; the latter, like a harassment claim without any constructive discharge assertion, may or may not involve official action. See Brief for United States as *Amicus Curiae* 24.

To be sure, a constructive discharge is functionally the same as an actual termination in damages-enhancing respects. See *supra*, at 147, n. 8. As the Third Circuit observed, both "en[d] the employer-employee relationship," and both "inflic[t] . . . direct economic harm." 325 F. 3d, at 460 (internal quotation marks omitted). But when an official act does not underlie the constructive discharge, the *Ellerth* and *Faragher* analysis, we here hold, calls for extension of the affirmative defense to the employer. As those leading decisions indicate, official directions and declarations are the acts most likely to be brought home to the employer, the measures over which the employer can exercise greatest control. See *Ellerth*, 524 U. S., at 762. Absent "an official act of the enterprise," *ibid.*, as the last straw, the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force. And as *Ellerth* and *Faragher* further point out, an official act reflected in company records—a demotion or a reduction in compensation, for example—shows "beyond question" that the supervisor has used his managerial or controlling position to the employee's disadvantage. See *Ellerth*, 524 U. S., at 760. Absent such an official act, the extent to which the supervisor's misconduct has been aided by the agency relation, as we earlier recounted, see *supra*, at

145, is less certain. That uncertainty, our precedent establishes, see *supra*, at 145–146, justifies affording the employer the chance to establish, through the *Ellerth/Faragher* affirmative defense, that it should not be held vicariously liable.

The Third Circuit drew the line differently. Under its formulation, the affirmative defense would be eliminated in all hostile-environment constructive discharge cases, but retained, as *Ellerth* and *Faragher* require, in "ordinary" hostile work environment cases, *i. e.*, cases involving no tangible employment action. That placement of the line, anomalously, would make the *graver* claim of hostile-environment constructive discharge *easier* to prove than its lesser included component, hostile work environment. Moreover, the Third Circuit's formulation, that court itself recognized, would make matters complex, indeed, more than a little confusing to jurors. Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case. Juries would be so informed. Under the Third Circuit's decision, a jury, presumably, would be cautioned to consider the affirmative-defense evidence only in reaching a decision on the hostile work environment claim, and to ignore or at least downplay that same evidence in deciding the closely associated constructive discharge claim. It makes scant sense thus to alter the decisive instructions from one claim to the next when the only variation between the two claims is the severity of the hostile working conditions. Cf. *Faragher*, 524 U. S., at 801 (affirming "the virtue of categorical clarity").

We note, finally, two recent Court of Appeals decisions that indicate how the "official act" (or "tangible employment action") criterion should play out when constructive discharge is alleged. Both decisions advance the untangled approach we approve in this opinion. In *Reed* v. *MBNA Marketing Systems, Inc.*, 333 F. 3d 27 (CA1 2003), the plaintiff claimed a constructive discharge based on her supervisor's

repeated sexual comments and an incident in which he sexually assaulted her. The First Circuit held that the alleged wrongdoing did not preclude the employer from asserting the *Ellerth/Faragher* affirmative defense. As the court explained in *Reed,* the supervisor's behavior involved no official actions. Unlike, *"e. g.,* an extremely dangerous job assignment to retaliate for spurned advances," 333 F. 3d, at 33, the supervisor's conduct in *Reed* "was exceedingly unofficial and involved no direct exercise of company authority"; indeed, it was "exactly the kind of wholly unauthorized conduct for which the affirmative defense was designed," *ibid.* In contrast, in *Robinson* v. *Sappington,* 351 F. 3d 317 (CA7 2003), after the plaintiff complained that she was sexually harassed by the judge for whom she worked, the presiding judge decided to transfer her to another judge, but told her that "her first six months [in the new post] probably would be 'hell,'" and that it was in her "'best interest to resign.'" *Id.,* at 324. The Seventh Circuit held that the employer was precluded from asserting the affirmative defense to the plaintiff's constructive discharge claim. The *Robinson* plaintiff's decision to resign, the court explained, "resulted, at least in part, from [the presiding judge's] official actio[n] in transferring" her to a judge who resisted placing her on his staff. *Id.,* at 337. The courts in *Reed* and *Robinson* properly recognized that *Ellerth* and *Faragher,* which divided the universe of supervisor-harassment claims according to the presence or absence of an official act, mark the path constructive discharge claims based on harassing conduct must follow.

### 2

In its summation, the Third Circuit qualified its holding that a constructive discharge itself "constitutes a tangible employment action within the meaning of *Ellerth* and *Faragher."* 325 F. 3d, at 462. The affirmative defense *Ellerth* and *Faragher* delineated, the court said, might be imported into the anterior issue whether "the employee's deci-

sion to resign was reasonable under the circumstances." 325 F. 3d, at 462.[10] As the Third Circuit expressed its thinking:

> "[I]t may be relevant to a claim of constructive discharge whether an employer had an effective remedial scheme in place, whether an employer attempted to investigate, or otherwise to address, plaintiff's complaints, and whether plaintiff took advantage of alternatives offered by antiharassment programs." *Ibid.*

These considerations, the Third Circuit recognized, "are, of course, the same considerations relevant to the affirmative defense in *Ellerth* and *Faragher.*" *Ibid.*

The Third Circuit left open when and how the *Ellerth/ Faragher* considerations would be brought home to the fact trier. It did not address specifically the allocation of pleading and persuasion burdens. It simply relied on "the wisdom and expertise of trial judges to exercise their gatekeeping authority when assessing whether all, some, or none of the evidence relating to employers' antiharassment programs and to employees' exploration of alternative avenues warrants introduction at trial." 325 F. 3d, at 463.

---

[10] For similar expressions, see, *e. g., Jaros* v. *LodgeNet Entertainment Corp.*, 294 F. 3d 960, 965 (CA8 2002) (though not entitled to the *Ellerth/ Faragher* affirmative defense, employer facing constructive discharge complaint may assert that plaintiff "did not give it a chance to respond to her [grievance]" in rebutting plaintiff's contention that conditions were so intolerable as to force her resignation); *Marrero* v. *Goya of Puerto Rico, Inc.*, 304 F. 3d 7, 28 (CA1 2002) ("the jury reasonably can take into account how the employer responded to the plaintiff's complaints, if any," in deciding whether conditions were intolerable); *Hartman* v. *Sterling, Inc.*, No. Civ. A. 01–CV–2630, 2003 WL 22358548, *13 (ED Pa., Sept. 10, 2003) (noting "it is relevant," but not dispositive, whether plaintiff complained); Brief for Lawyers' Committee for Civil Rights Under Law et al. as *Amici Curiae* 19 (affirmative defense unnecessary because of "the overlap between elements of constructive discharge and of the *Faragher/Ellerth* [affirmative] defense").

We see no cause for leaving the district courts thus unguided. Following *Ellerth* and *Faragher*, the plaintiff who alleges no tangible employment action has the duty to mitigate harm, but the defendant bears the burden to allege and prove that the plaintiff failed in that regard. See *supra*, at 146. The plaintiff might elect to allege facts relevant to mitigation in her pleading or to present those facts in her case in chief, but she would do so in anticipation of the employer's affirmative defense, not as a legal requirement.

* * *.

We agree with the Third Circuit that the case, in its current posture, presents genuine issues of material fact concerning Suders' hostile work environment and constructive discharge claims.[11] We hold, however, that the Court of Appeals erred in declaring the affirmative defense described in *Ellerth* and *Faragher* never available in constructive discharge cases. Accordingly, we vacate the Third Circuit's judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, dissenting.

As the Court explains, the National Labor Relations Board (NLRB) developed the concept of constructive discharge to address situations in which employers coerced employees into resigning because of the employees' involvement in union activities. See *ante*, at 141–142. In light of this specific focus, the NLRB requires employees to establish two elements to prove a constructive discharge. First, the employer must impose burdens upon the employee that "cause, and [are] intended to cause, a change in his working conditions so difficult or unpleasant as to force him to resign.

---

[11] Although most of the discriminatory behavior Suders alleged involved unofficial conduct, the events surrounding her computer-skills exams, see *supra*, at 136, were less obviously unofficial.

Second, it must be shown that those burdens were imposed because of the employee's union activities." *Crystal Princeton Refining Co.*, 222 N. L. R. B. 1068, 1069 (1976).

When the constructive discharge concept was first imported into Title VII of the Civil Rights Act of 1964, some courts imposed similar requirements. See, *e. g., Muller* v. *United States Steel Corp.*, 509 F. 2d 923, 929 (CA10 1975) (requiring a showing that "an employer deliberately render[ed] the employee's working conditions intolerable and thus force[d] him to quit his job"). Moreover, because the Court had not yet recognized the hostile work environment cause of action, the first successful Title VII constructive discharge claims typically involved adverse employment actions. See, *Muller, supra* (denial of job promotion); *Derr* v. *Gulf Oil Corp.*, 796 F. 2d 340, 344 (CA10 1986) (demotion). If, in order to establish a constructive discharge, an employee must prove that his employer subjected him to an adverse employment action with the specific intent of forcing the employee to quit, it makes sense to attach the same legal consequences to a constructive discharge as to an actual discharge.

The Court has now adopted a definition of constructive discharge, however, that does not in the least resemble actual discharge. The Court holds that to establish "'constructive discharge,'" a plaintiff must "show that the abusive working environment became so intolerable that [the employee's] resignation qualified as a fitting response." *Ante*, at 134. Under this rule, it is possible to allege a constructive discharge absent any adverse employment action. Moreover, a majority of Courts of Appeals have declined to impose a specific intent or reasonable foreseeability requirement. See, *e. g., Brooks* v. *San Mateo*, 229 F. 3d 917, 930 (CA9 2000) ("[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent,

diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer" (internal quotation marks omitted)).

Thus, as it is currently conceived, a "constructive" discharge does not require a "company ac[t] that can be performed only by the exercise of specific authority granted by the employer," *Burlington Industries, Inc.* v. *Ellerth,* 524 U. S. 742, 768 (1998) (THOMAS, J., dissenting) (*i. e.,* an adverse employment action), nor does it require that the act be undertaken with the same purpose as an actual discharge. Under these circumstances, it no longer makes sense to view a constructive discharge as equivalent to an actual discharge. Instead, as the Court points out, a constructive discharge is more akin to "an aggravated case of ... sexual harassment or hostile work environment." *Ante,* at 146. And under this "hostile work environment plus" framework, the proper standard for determining employer liability is the same standard for hostile work environment claims that I articulated in *Burlington Industries, Inc., supra.* "An employer should be liable if, and only if, the plaintiff proves that the employer was negligent in permitting the supervisor's conduct to occur." *Id.,* at 767. If a supervisor takes an adverse employment action because of sex that directly results in the constructive discharge, the employer is vicariously liable. *Id.,* at 768. But, where the alleged constructive discharge results only from a hostile work environment, an employer is liable if negligent. *Ibid.* Because respondent has not adduced sufficient evidence of an adverse employment action taken because of her sex, nor has she proffered any evidence that petitioner knew or should have known of the alleged harassment, I would reverse the judgment of the Court of Appeals.