Justice THOMAS, dissenting.
Title VII of the Civil Rights Act of 1964 prohibits employers from engaging in discriminatory acts against their employees. Under a 1992 Equal Employment Opportunity Commission (EEOC) regulation implementing Title VII, federal employees "who believe they have been discriminated against" "must consult a [n] [EEOC] Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 CFR § 1614.105(a) (2015). In particular, the aggrieved employee "must initiate contact *1791 with a Counselor within 45 days of date of the matter alleged to be discriminatory." § 1614.105(a)(1).
Today, the majority holds that a "matter alleged to be discriminatory" includes a matter that is not "discriminatory" at all: a federal employee's decision to quit his job. Ante, at 1775 - 1777. The majority reaches this conclusion by adopting an atextual reading of the regulation that expands the constructive-discharge doctrine. Consistent with the text of the regulation and history of the constructive-discharge doctrine, I would hold that only an employer's actions may constitute a "matter alleged to be discriminatory." Because the only employer action alleged to be discriminatory here took place more than 45 days before petitioner Marvin Green contacted EEOC, his claims are untimely. I therefore respectfully dissent.
I
The meaning of a "matter alleged to be discriminatory" refers to actions taken by the employer, not the employee. This follows from the ordinary meaning of "matter" and "discriminatory," as well as this Court's precedents.
A
I begin with " 'the language [of the regulation] itself and the specific context in which that language is used.' " McNeill v. United States, 563 U.S. 816, 819, 131 S.Ct. 2218, 180 L.Ed.2d 35 (2011)(brackets omitted). When a word or phrase is left undefined-as "matter alleged to be discriminatory" is-we consider its "ordinary meaning." Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995). A "matter" is "a subject under consideration, esp. involving a dispute or litigation" or "[s]omething that is to be tried or proved; an allegation forming the basis of a claim or defense." Black's Law Dictionary 992 (7th ed. 1999); The Oxford English Dictionary 481 (2d ed. 1989) ("matter" means "[a]n event, circumstance, fact, question, state or course of things, etc., which is or may be an object of consideration or practical concern; a subject, an affair, a business"); see ante, at 1775 - 1776 (embracing this view). The term "discriminatory" means characterized by differential treatment that lacks a sound justification. See The Random House Dictionary of the English Language 564 (2d ed. 1987) ("discriminatory" means "characterized by or showing prejudicial treatment esp. as an indication of racial, religious, or sexual bias"); B. Garner, A Dictionary of Modern Legal Usage 191 (1987) ("discriminatory" means "applying discrimination in treatment, esp. on ethnic grounds"); Black's Law Dictionary 479 ("discrimination" means characterized by "[d]ifferential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored"). Thus, a "matter alleged to be discriminatory" means an employee's allegation that he was treated in an unjustifiably differential manner.
In the context of employment discrimination, only an employer can discriminate against-or apply unjustifiable differential treatment to-an employee.[1] An employee cannot plausibly be said to discriminate against himself. It therefore makes no sense to say that an employee's act of quitting constitutes an action in which he was treated in a differential manner that lacked a sound justification.
*1792 And, it does not make any more sense to say that an employee's decision to quit is itself "discriminatory" simply because it may result from antecedent discriminatory conduct. As two of our precedents-National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), and Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)-illustrate, the "matter alleged to be discriminatory" is the reason the employee quit, and not the quitting itself.
In Morgan, we rejected the argument that a phrase similar to "matter alleged to be discriminatory"-namely, an "alleged unlawful employment practice"-"connotes an ongoing violation that can endure or recur over a period of time." 536 U.S., at 109-111, 122 S.Ct. 2061. We held that discrete discriminatory acts of the employer occurring outside a filing period were not actionable, even if connected to other acts within the period. Id., at 113, 122 S.Ct. 2061. The word "practice," we explained, did not "conver[t] related discrete acts into a single unlawful practice for the purposes of timely filing." Id., at 111, 122 S.Ct. 2061. The same is true of the word "matter." See, e.g., EEOC Compliance Manual: Threshold Issues § 2-IV(C)(1), n. 179 (equating "matter alleged to be discriminatory" with "the alleged discriminatory employment practice"), online at http://www.eeoc.gov/policy/docs/threshold.html (as last visited Mar. 29, 2016) (equating "matter alleged to be discriminatory" with "the alleged discriminatory employment practice").
Ricks complements Morgan by holding that discrimination occurs when an employer takes some adverse action against the employee, and not when the employee feels the consequences of that action. 449 U.S., at 257-258, 101 S.Ct. 498. In Ricks, we considered the timeliness of an EEOC complaint that a professor filed after he was allegedly denied tenure on account of his national origin. Id., at 252-254, 101 S.Ct. 498. The employer offered him a contract to teach one more year after it denied tenure. Id ., at 255, 101 S.Ct. 498. The professor contended that his claim did not accrue until his 1-year contract expired, because the offer of the contract constituted a " 'continuing violation.' " Id ., at 257, 101 S.Ct. 498. We rejected that argument and explained that "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." Ibid. ; see also Chardon v. Fernandez, 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981)(per curiam ) (holding that claims of administrators of the Puerto Rican Department of Education were untimely because their claims accrued when they received notice that they would be fired and not on the effective date of their terminations).
The alleged employer conduct that most immediately prompted Green's decision to quit was the Postal Service's request on or about December 15, 2009, that he sign a settlement agreement. See App. 17, ¶ 72; App. 19, ¶ 83. It is irrelevant whether Green's decision to quit "g[a]v[e] present effect to the past illegal act[s] and therefore perpetuate[d] the consequences of forbidden discrimination." Ricks, supra, at 258, 101 S.Ct. 498(internal quotation marks omitted). Because the Postal Service's December 15 request is the "matter alleged to be discriminatory," Green had 45 days from December 15 to initiate contact with EEOC.[2] Because he was 52 days late in doing so, his claim was untimely.
*1793 B
The majority reaches the opposite conclusion for three reasons. None withstands scrutiny.
First, the majority observes that the text of the regulation is "not particularly helpful" because the word "matter" simply means " 'an allegation forming the basis of a claim or defense,' " which "could readily apply to a discrimination-precipitated resignation." Ante, at 1776. Thus, the majority contends, "matter" could "reasonably be interpreted to include the factual basis for a claim," which, in its view, includes Green's decision to resign. Ante, at 1778 - 1779. But, as explained, that interpretation does not grapple with the entire phrase, "matter alleged to be discriminatory, " which does not encompass the subsequent nondiscriminatory actions that the employee takes.
Second, the majority contends that the "standard rule for limitations periods" informs its understanding of 29 CFR § 1614.105. Ante, at 1776 - 1777 (internal quotation marks omitted). Under this rule, the majority contends, a limitations period does not begin to run until there is a "complete and present cause of action." Ante, at 1776 (internal quotation marks omitted). The majority concludes that there is no "complete and present cause of action" for constructive discharge until "an employee resigns." Ibid. (internal quotation marks omitted).
Even assuming that an employee's resignation was an essential part of a constructive discharge "claim" (but see Part II, infra ) the "standard rule" is merely a "default" rule. Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 418, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005). That "default rule" does not apply, however, where-as here-the text confirms that the limitations period begins to run before the cause of action accrues.
Pillsbury v. United Engineering Co., 342 U.S. 197, 72 S.Ct. 223, 96 L.Ed. 225 (1952), confirms this point. In that case, the Court considered a statute that provided that " '[t]he right to compensation for disability ... shall be barred unless a claim therefor is filed within one year after the injury.' " Id., at 197, 72 S.Ct. 223(quoting 33 U.S.C. § 913(a) (1952)). The Court held that the 1-year period began at the time of injury, not when the employee later became disabled as a result of the injury and concluded that "Congress meant what it said when it limited recovery to one year from date of injury, and 'injury' does not mean 'disability.' " 342 U.S., at 199-200, 72 S.Ct. 223. Although that reading meant that "an employee [could] be barred from filing his claim before his right to file it arises," the Court refused to "rewrite the statute of limitations" to avoid that result. Ibid. ; see also, e.g., Dodd v. United States, 545 U.S. 353, 357-360, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005)(giving effect to the clear text of a limitations provision even though that reading "ma[de] it difficult" for certain movants "to obtain relief" and could lead to "harsh results").
Like the limitations provision in Pillsbury, 29 CFR § 1614.105makes clear that the limitations period could begin before any constructive-discharge claim accrues, lest "what was intended to be a limitation [be] no limitation at all." 342 U.S., at 200, 72 S.Ct. 223. The regulation instructs that the limitations period begins to run when *1794 the "matter alleged to be discriminatory" occurs-i.e., the discriminatory conduct of the employer. To say that this includes Green's resignation could "have the effect of extending the limitation indefinitely." Ibid .; see Part I-A, supra .
Finally, the majority downplays Morgan and Ricks by claiming that Green's resignation was "not merely an inevitable consequence of the discrimination he suffered; it is an essential part of his constructive-discharge claim." Ante, at 1780. "[A] claim that an employer constructively discharged an employee," the majority contends, "is no different from a claim that an employer actually discharged an employee." Ante, at 1777. This reasoning cannot be reconciled with the regulatory text and fails to grapple with our precedents. By isolating Green's late response to the settlement agreement rather than his employer's alleged coercion of Green to sign that agreement, the majority ignores the discriminatory act and bestows on Green an advantage that other employees subject to wrongful discrimination do not have. Had Green signed termination papers rather than settlement papers, there would be no question about the untimeliness of his claims. As in Ricks, the time for Green's claim would have begun to run when his employer discriminated against him, even if the termination was not effective until months later. 449 U.S., at 257, 101 S.Ct. 498; see also Chardon, 454 U.S., at 8, 102 S.Ct. 28(same). But today, the majority decides that Green's claim is different. In doing so, the majority elevates constructive discharge to the status of a super termination capable of extending a limitations period far beyond the time the employer acted discriminatorily.
II
The majority's error is not merely one of regulatory misinterpretation. By misreading the regulation, the majority expands the constructive-discharge doctrine beyond its original bounds. In particular, the majority cements the (mistaken) notion that constructive discharge is an independent cause of action-and not a mere counterdefense-by unjustifiably focusing on an employee's response to an employer's conduct. See, e.g., ante, at 1776 - 1781. In doing so, the majority exacerbates the problems that Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), first created in adopting a capacious definition of "constructive discharge."
A
In holding that a discrimination claim based on constructive discharge accrues when an employee resigns, the majority wrongly assumes that constructive discharge is a separate claim equivalent to an actual discharge under Title VII. Ante, at 1778 - 1779. But the constructive-discharge doctrine is best understood as "a counter-defense to the employer[']s defense that the worker [voluntarily] quit," and not a separate claim. EEOC v. R.J. Gallagher Co., 959 F.Supp. 405, 408 (S.D.Tex.1997), vacated in part on other grounds, 181 F.3d 645 (C.A.5 1999).
The National Labor Relations Board (NLRB) developed the constructive-discharge doctrine in the 1930's "to address situations in which employers coerced employees to resign, often by creating intolerable working conditions, in retaliation for employees' engagement in collective activities." Suders, supra, at 141, 124 S.Ct. 2342; see also Shuck, Comment, That's It, I Quit: Returning to First Principles in Constructive Discharge Doctrine, 23 Berkeley J. Empl. & Lab. L. 401, 406-407 (2002). An employee who voluntarily quit usually lost the right to backpay and other remedies, whereas an employee who was *1795 fired for discriminatory reasons did not. See id ., at 403. The constructive-discharge doctrine enabled courts to provide a remedy to those employees who voluntarily quit based on the fiction that their decision to quit was not actually voluntary. See ibid. ; Suders, supra, at 147, n. 8, 124 S.Ct. 2342. Thus, as it was originally conceived, constructive discharge was not an independent cause of action but instead a counterdefense to an employer's contention that a resignation was voluntary, and thus, should "factor into the damages." Knabe v. Boury Corp., 114 F.3d 407, 408, n. 1 (C.A.3 1997); see also Russ v. Van Scoyoc Assoc., Inc., 122 F.Supp.2d 29, 35-36 (D.D.C.2000)(collecting cases). So understood, an employee's resignation does not complete any cause of action, and thus does not trigger the limitations period.
The majority contends that Suders marked a departure from this original conception of constructive discharge by "expressly h[o]ld[ing] that constructive discharge is a claim distinct from the underlying discriminatory act." Ante, at 1779. But, that case does not resolve the issue one way or the other. To be sure, Suders contains a few statements suggesting that constructive discharge is a claim. As the majority points out, for example, Suders states that a hostile work environment claim is less "grav[e]" than a "claim of hostile-environment constructive discharge," and "a claim for constructive discharge lies under Title VII." Ante, at 1779 (citing Suders, 542 U.S., at 142, 149, 124 S.Ct. 2342; emphasis added); see also id., at 133, 124 S.Ct. 2342(referring to "sexual harassment/constructive discharge claim"); id., at 143, 124 S.Ct. 2342(referring to "constructive discharge claims"). At the same time, however, the question at issue in Suders was the availability of affirmative defenses. In that vein, Suders held only that employers could avail themselves of those defenses if an "official act" of the company "d[id] not underlie the constructive discharge." Id ., at 148, 124 S.Ct. 2342. There are also statements throughout the Suders opinion that are flatly inconsistent with the reading that the majority suggests. For example, it points out that an employee's resignation is "assimilated to a formal discharge" for "remedial purposes, " without mentioning liability. Id ., at 141, 124 S.Ct. 2342(emphasis added); see also id., at 147, n. 8, 124 S.Ct. 2342(noting that "a prevailing constructive discharge plaintiff is entitled to all damages available for formal discharge," including "backpay" and sometimes "frontpay"); id., at 148, 124 S.Ct. 2342("a constructive discharge is functionally the same as an actual termination in damages-enhancing respects " (emphasis added)). In short, Suders does not resolve whether constructive discharge depends on the underlying discriminatory act. And, it does not hold that constructive discharge is a cause of action that is distinct from the underlying discrimination claim.
B
The majority today not only exploits Suders ' imprecision about whether constructive discharge is an independent claim, but also takes advantage of that opinion's ambiguity as to what an employee must establish to invoke the doctrine. In Suders, I objected to the Court's statement that the constructive-discharge doctrine encompasses those situations in which "working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Id ., at 141, 124 S.Ct. 2342. That description does "not in the least resemble actual discharge" because it permits an employee "to allege a constructive discharge absent any adverse employment action" and absent any employer intent to cause a resignation.
*1796 Id., at 153-154, 124 S.Ct. 2342(THOMAS, J., dissenting).
Despite the Suders Court's overly broad description of the doctrine, the Court at least retained some focus on an employer's conduct. The Court in Suders explained that whether to "assimilat[e]" a constructive discharge "to a formal discharge for remedial purposes" entailed an "objective" inquiry that focused on the "working conditions" themselves. Id., at 141, 124 S.Ct. 2342. And, it held that an employer could raise certain affirmative defenses to stave off liability when no official action forced an employee to resign. Id., at 147, 124 S.Ct. 2342.
Today, the majority goes even further than Suders in eviscerating the limitations on the constructive-discharge doctrine. The majority's rule transforms constructive discharge into a claim focused on the employee's conduct, instead of the employer's. Green does not allege that, after he signed the settlement agreement, any other act-by a supervisor or even a co-worker-occurred or otherwise immediately precipitated his decision to quit. See App. 19, ¶¶ 83-85. The majority's holding-that Green's claim accrued when he resigned-must rest then on Green's own subjective feelings about the forced settlement. By ignoring the date on which an employer's discriminatory act occurred and instead focusing only on an employee's subjective response to that discriminatory act (see ante, at 1779 - 1781), the majority dispenses with the function of an employer's conduct. The effect of the majority's analysis, then, is that constructive discharge no longer involves any sort of objective inquiry.
I cannot agree. The concept of constructive discharge is already on tenuous footing. It is not based on the text of Title VII but instead on the fiction that an employee's resignation can be attributed to his employer in limited circumstances. As initially conceived by the NLRB, this fictitious attribution could be justified if an employer's unlawful employment practice "standing alone, render[ed] an employee's resignation reasonable and [thus] entitle[d] the employee to backpay." Shuck, 23 Berkeley J. Empl. & Lab. L., at 409 (emphasis added); see, e.g., In re Waples-Platter Co., 49 N.L.R.B. 1156, 1174-1175 (1943)(concluding that it was reasonable per se for the employees to quit in light of the nature of the employer's intentional, discriminatory transfers). Such attribution cannot be justified, however, where-as here-the constructive discharge accrues based solely on an employee's subjective response to alleged discrimination.
* * *
Because Green has not proffered any evidence that discrimination continued to occur after he signed the settlement agreement, his contact with EEOC was untimely under 29 CFR § 1614.105. Accordingly, I would affirm the judgment of the Court of the Appeals.

This 180- or 300-day period is often referred to as the "charging" or "filing" period. See, e.g., Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 624, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007); National Railroad Passenger Corporation v. Morgan, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Because the 45-day period at issue in this case involves initiating counseling rather than filing a charge, for simplicity I refer to all of these periods as "limitations" periods.

EEOC Compliance Manual: Threshold Issues § 2-IV(C)(1), and n. 179 (emphasis added), online at http://www.eeoc.gov/policy/docs/threshold.html (as last visited May 20, 2016).