[Cite as *Greenberg v. Toledo Pub. Schools*, 2023-Ohio-864.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


Julie Greenberg                                     Court of Appeals No.  L-22-1137

      Appellant                                Trial Court No.  CI0202003668

v.

Toledo Public Schools                    **DECISION AND JUDGMENT**

      Appellee                                 Decided:  March 17, 2023

* * * * *

Catherine H. Killam and Matthew B. Bryant, for appellant.

Amy M. Natyshak and Meghan Anderson Roth, for appellee.

* * * * *

**SULEK, J.**

{¶ 1} Appellant, Julie Greenberg, appeals the May 16, 2022 judgment of the Lucas County Court of Common Pleas which granted summary judgment to appellee, Toledo Public Schools ("TPS"), on her hostile-work environment, sexual harassment claim. Because we agree that no material issues of fact remain, we affirm.

## I. Background

### A. The Relevant Events

**{¶ 2}** Greenberg, after teaching at various area school districts, began her employment with TPS for the 2012/13 school year as a special education/intervention teacher at Robinson Elementary School. The principal at Robinson was Anthony Bronaugh. As a teacher new to TPS, an intern consultant was assigned to support and evaluate her throughout the course of her first teaching year. The consultant was responsible for reporting to the Intern Board of Review which would ultimately determine whether Greenberg's contract would be renewed.

**{¶ 3}** According to Greenberg's complaint and deposition, beginning in September 2012, Bronaugh spent an "unreasonable" amount of time observing her classroom. Specifically, he would come in to her room three to four times per week and stay five to ten minutes. Greenberg claimed that the intern consultant was responsible for observing her classroom and doing any evaluations, not Bronaugh. In addition to observing her in the classroom, Greenberg stated that Bronaugh would leer at her in the hallway, tell her she looked nice, and make unwanted sexual comments. Greenberg stated that Bronaugh asked if she had ever been a model; he also said that she looked like Jessica Rabbit from the movie "Who Framed Roger Rabbit" and that red hair would look good on her. Bronaugh asked for her cell number stating that he texted evaluations; Greenberg never received one. Greenberg stated she did not immediately report these interactions because

2.

she had been warned early in her time at TPS that Bronaugh had an odd sense of humor and to not take him seriously.

{¶ 4} On November 8, 2012, the night of parent/teacher conferences, Greenberg stated that she was in her classroom when Bronaugh entered and said how lucky her husband was to be married to her. Bronaugh also stated and that he could not believe how lucky he was that they hired Greenberg so that he could look at her every day. He then mentioned that if he was Greenberg's husband, he would have sex with her every day. Greenberg alleged that Bronaugh had a visible erection during this interaction and that he told her to rub against or touch it if she wanted to.

{¶ 5} Later that evening, Greenberg stated that she had been making copies when Bronaugh pressed behind her and hugged her. Bronaugh then attempted to get Greenberg to come to his office to talk; he also suggested they go someplace private and get a drink. The next morning, Bronaugh contacted Greenberg again and tried to get her to join him someplace private. He then requested she come to his office. She went with the intent of again telling him she was not interested. According to Greenberg, Bronaugh began discussing sexual positions, and he stated that he wanted to restrain her and pull her hair. He then asked her to go to the gym with him so he could give her a hug. After Greenberg refused, Bronaugh cornered her in the room and tried to kiss her.

{¶ 6} Greenberg stated that she rejected all of Bronaugh's advances many times with a verbal "no," but that he persisted. She told him how the harassment was making her job more difficult. On the evening of November 10, 2012, Greenberg contacted her

3.

intern consultant to report Bronaugh's harassment. The consultant contacted her supervisor who, in turn, contacted human resources.

{¶ 7} The next day, the consultant went to Robinson to check on Greenberg. At some point later in the day, a school official escorted Bronaugh from the building, and the consultant walked Greenberg to her car that afternoon because she was afraid that Bronaugh would be waiting for her.

{¶ 8} Thereafter, on November 12, Greenberg filed a written complaint on a form titled "Discriminatory Harassment Complaint," setting forth the incidents detailed above to Cheryl Spieldenner, TPS' head of human resources. The next day, TPS sent Greenberg a letter acknowledging receipt of her complaint and explaining that Bronaugh had been notified of the complaint and instructed to have no contact with her.

{¶ 9} On November 15, 2012, Bronaugh received a letter from TPS informing him that, effective immediately, he was suspended without pay. The letter further stated:

> Please return any Toledo Public Schools property including keys, fob, ID. While on suspension you are not permitted to be on any Toledo Public Schools property or attend any TPS sponsored functions until further notice. As a reminder you are to have no contact with this teacher either directly or indirectly or in veiled messages or announcements.

{¶ 10} On November 19, 2012, Spieldenner sent a letter to Greenberg reiterating that Bronaugh was barred from all TPS buildings and property. The letter stated:

4.

Mr. Bronaugh has been informed not only through this district but I am assuming as a result of the protection order that he is not to enter Robinson. To do so would cause security and Toledo Police to be called. If he does violate the conditions of this directive, criminal charges will be filed.

It was further stressed that TPS security was present at Robinson "frequently" during the day and that they are accessible 24/7; the contact number was provided.

{¶ 11} Greenberg did not return to Robinson until November 20, 2012. According to Greenberg, someone had entered her locked classroom and found a poster about gossiping that they posted on her bulletin board. Greenberg stated that she did not feel safe on the premises, and she did not return to Robinson after that day. She tendered her resignation on December 14, 2012.

### B. The Investigation

{¶ 12} The investigation into Greenberg's complaint commenced on November 16, 2012. Instead of conducting an internal investigation, TPS opted to have the City of Toledo investigate the complaint for the stated reason that the TPS harassment committee had just been reconfigured and was too new. [1]

---

[1] Greenberg stresses, relying on the affidavit of Cheryl Spieldenner, that the committee was new only because it was reconfigured by the superintendent, who was aware of the complaint, just days prior to the investigation. Reviewing the affidavit and the documents attached, we note that Spieldenner further explained that the committee had been reconfigured, in part, due to member recusing herself due to a personal friendship with Bronaugh.

5.

**{¶ 13}** On February 19, 2013, the investigators issued their final report and recommendation. They interviewed 13 individuals, including Greenberg, Bronaugh, Spieldenner, Greenberg's intern consultant, and various teachers and school personnel. The investigators also reviewed the relevant documents and conducted a site visit.

**{¶ 14}** The investigation was guided by TPS' anti-discrimination and sexual harassment policy, referred to by the parties as Board Policy ACA, which relevantly provides:

> Sexual harassment consists of unwelcome and unsolicited sexual advances, requests for sexual favors, sexually motivated physical conduct or other oral or physical conduct or communication of a sexual nature when:
>
> * * *
>
> 3. that conduct or communication has the purpose or effect of substantially or unreasonably interfering with an individual's employment or education, or creating an intimidating, hostile, offensive, threatening or abusive work or academic environment.

**{¶ 15}** As to the evidence deduced during the investigation, in his interviews prior to and after Greenberg's January 2013 interview, Bronaugh denied most of Greenberg's allegations. But he did admit that on November 9, 2012, they had an inappropriate conversation regarding sexual positions but claimed that Greenberg initiated it. The investigator found this a violation of Board Policy ACA as an inappropriate conversation

6.

in the workplace as well as inappropriate in the authority-subordinate relationship of principal and teacher.

{¶ 16} Bronaugh also admitted that he told Greenberg she was beautiful and looked nice and that he remarked she resembled Jessica Rabbit. He asked her if she used to be a model and told her that her husband was a very lucky man. Bronaugh also admitted to requesting Greenberg's cell number to text evaluations, sending her one Gmail chat request after hours, and visiting Greenberg's classroom for School Improvement Grant (SIG) purposes. The investigators determined that these admissions did not rise to the level of a violation of Board policy.

{¶ 17} As to the November 8, 2012 copier incident, the investigators concluded that the location of the copier in the office suite (a cramped space between the copier and the refrigerator) made the incident "improbable." In addition, video surveillance footage of the office suite revealed several teachers in the room eating at that time and a statement by a secretary at the school corroborated Bronaugh's statement that had been eating his dinner. The earlier-in-the-day incident in Greenberg's classroom was denied by Bronaugh and the investigators determined it could not be substantiated as there were no witnesses.

{¶ 18} Through the teacher's union, Greenberg learned that two unidentified women had previously, albeit informally, complained about Bronaugh. A third name was subsequently uncovered. The investigators' report states that they received the women's names and contact information from TPS through Spieldenner who acted as the liaison

7.

between TPS and the investigators. In her subsequent deposition, however, Spieldenner claimed no prior knowledge of the individuals, where the names emanated from, or that she had given the names to the investigators. The investigators' report stated that they tried to contact and interview each of the women but received no response.

{¶ 19} The investigators recommended that due to his conduct on November 9, 2012, Bronaugh attend a mandatory training on Board Policy ACA and that he be subject to progressive discipline. TPS ultimately issued a three-day, unpaid suspension to Bronaugh.

### C. The Trial Court Proceedings

{¶ 20} Greenberg initially commenced this action in 2018; it was dismissed without prejudice and refiled in 2020. Her sole claim is that TPS, through action or inaction, created a hostile work environment for Greenberg based upon sex in violation of R.C. 4112.02(A). Greenberg alleges that Bronaugh's conduct was so pervasive and unwelcome that she reasonably had no choice but to resign. Greenberg also seeks monetary and emotional damages.

{¶ 21} TPS filed a motion for summary judgment on November 29, 2021, arguing that Greenberg could not establish the necessary element that either Bronaugh was her supervisor or that TPS knew or should have known of the harassment and failed to take immediate and appropriate corrective action. In response, Greenberg claimed that issues of fact remained as to whether TPS knew or should have known that Bronaugh was a

8.

"serial harasser of females" and failed to prevent harassment of Greenberg and whether Greenberg reasonably felt compelled to resign.

{¶ 22} On May 16, 2022, the trial court granted TPS' motion finding that reasonable minds could not conclude that TPS had actual or constructive notice of the sexual harassment, that TPS failed to timely and appropriately take corrective action upon learning of the harassment, and that a reasonable person in Greenberg's situation would have felt compelled to resign. This appeal followed.

## II. Assignments of Error

Assignment of Error Number One: The trial court erred in finding, as a matter of law, that TPS did not know or have constructive knowledge of Bronaugh's sexual harassment of women in the work place.

Assignment of Error Number Two: The trial court erred in finding, as a matter of law, that TPS took timely, effective action to address the sexual harassment of which it ought to have been aware.

Assignment of Error Number Three: The trial court erred in finding, as a matter of law, that a reasonable person would not have felt compelled to resign under the circumstances presented.

## III. Discussion

{¶ 23} Initially, we note that an appellate court reviews the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Bliss v. Johns Manville*, Slip Opinion No. 2022-Ohio-4366, ¶ 12. Under Civ.R. 56(C), a

9.

trial court shall grant summary judgment only where (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party.

{¶ 24} Greenberg brought a claim for gender discrimination under R.C. 4112.02(A), which provides: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

> [A] plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two types of sexual harassment: (1) "quid pro quo" harassment, i.e., harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, i.e., harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment.

*Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726 (2000), paragraph one of the syllabus.

**{¶ 25}** In order to establish a claim of hostile-environment sexual harassment under R.C. 4112.02(A), the employee must show

> (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

*Id.* at paragraph two of the syllabus.

### A. Constructive Knowledge of Prior Sexual Harassment

**{¶ 26}** Greenberg's first assignment of error asserts that the trial court erroneously concluded that TPS did not have constructive knowledge of Bronaugh's "serial harassment of women." TPS frames the question more narrowly as to whether TPS had knowledge of Bronaugh's harassment of Greenberg; they also dispute the claim under the broader reading.

**{¶ 27}** Accepting Greenberg's argument that Bronaugh was a co-worker rather than a supervisor, TPS could be liable for his sexual harassment of Greenberg under the negligence theory for its failure to take corrective measures where it had actual or constructive knowledge of the harassment. *Harmon v. GZK, Inc.*, 2d Dist. Montgomery No. 18672, 2002 WL 191598 (Feb. 8, 2002) *13, citing *Hampel*, passim. Constructive

11.

knowledge can be imputed to the employer where the acts were so pervasive that it gives rise to an inference of knowledge or constructive knowledge, because it should have "'come to the attention of someone authorized to do something about it.'" *Id.*, quoting *BreMiller v. Cleveland Psychiatric Inst.*, 195 F.R.D., 1, 28-29 (N.D.Ohio 2000).

{¶ 28} TPS first learned of the harassment of Greenberg, or had actual knowledge, on November 12, 2012, and a few days thereafter it placed Bronaugh on administrative leave, banned him from TPS property, and began investigating the matter with the assistance of investigators from the City of Toledo. This demonstrates that TPS took immediate and appropriate corrective action as to Bronaugh's harassment of Greenberg. *Hampel* at paragraph two of the syllabus.

{¶ 29} As to the argument that TPS had constructive knowledge of Bronaugh's proclivity for harassing female co-workers and failed to take action, TPS employee, L.J., stated in her deposition that in 2002, Bronaugh made comments that made her feel uncomfortable, such as thanking female staff when they would bend over or wear a shirt that showed cleavage. She and another secretary contacted the clerical specialist in human resources to complain; however, no specific action was requested or taken and no formal complaint was filed. Years later in 2012, during the investigation of Greenberg's complaint, L.J. was questioned by Spieldenner about her experiences with Bronaugh.

{¶ 30} Further, in 2010, counseling student intern, D.B., complained to her supervisor, Virginia Ulch, about the unwanted attention she was getting from Bronaugh. Ulch stated in her deposition that D.B. did not want to file a complaint and Ulch's

12.

supervisor had her transferred to another building. Ulch had no knowledge of any other prior complaints.

{¶ 31} Finally, Jennifer Spoores, a TPS administrator, testified in her deposition that she had heard "rumors" about Bronaugh regarding inappropriate things he would say to staff members. Years prior, when she was a teacher at the same elementary as Bronaugh, he made a comment that made her feel "awkward." Spoores did not complain stating that she was able to handle it on her own.

{¶ 32} The above complaints were never formally made and there is no evidence, beyond rumors, that Bronaugh's conduct had created a hostile work environment for TPS staff. The fact that a 2016 sexual harassment complaint prompted Bronaugh's resignation has no bearing on what TPS knew or should have known in 2012, and what actions should have been taken.

{¶ 33} There being no triable issues of fact as to whether TPS had actual or constructive knowledge of Bronaugh's current and past sexual harassment of female co-workers, we conclude that Greenberg's first assignment of error is not well-taken.

### B. Action by TPS

{¶ 34} Greenberg's second assignment of error claims that a question of fact remains as to whether once TPS was made aware of the harassment, it failed to take timely, effective action to address the matter. TPS disputes this assertion.

{¶ 35} "When an employer has actual notice of coworker harassment, an employer generally is entitled to summary judgment on a sexual-harassment claim where the

employer's response was aimed at preventing, and did prevent, future harassment." *Klotz v. Game On Sports Bar & Grill*, 1st Dist. Hamilton No. C-210401, 2022-Ohio-2847, ¶ 43, citing *Thaman v. OhioHealth Corp.*, S.D.Ohio No. 2:03-cv-210, 2005 WL 1532550 (June 29, 2005); *McGraw v. Pilot Travel Ctrs., LLC*, 10th Dist. Franklin No. 11AP-699, 2012-Ohio-1076, ¶ 25-26.

**{¶ 36}** In *Klotz,* the court of appeals held that there was no genuine issue of material fact as to whether an employer failed to take immediate and appropriate corrective action in response to an employee's claim of sexual harassment where the employer: (1) issued a verbal warning to the alleged harasser within hours of receiving the complaint; (2) urged all employees to come forward immediately if they had experienced harassment; and (3) took steps to ensure the employee no longer had to be alone with the alleged harasser again. *Id.* at ¶ 44.

**{¶ 37}** In this case, and as previously stated, TPS did not have actual knowledge of Bronaugh's actions until being notified on November 12, 2012. It immediately banned Bronaugh from the building and from having any contact with Greenberg. Further, three days later, TPS placed Bronaugh on administrative leave pending the investigation. Finally, Greenberg acknowledges that she had no contact with Bronaugh following the filing of her complaint. Thus, like the employer's response in *Klotz*, TPS's response prevented future harassment.

**{¶ 38}** In addition, the fact that Greenberg was dissatisfied with the investigation or the fact that Bronaugh was only suspended for three days has little bearing on her

14.

claims. First, there is no evidence that the investigators assigned to the matter were biased or that TPS simply did not want to address the Bronaugh's alleged harassment. The reasons for contracting for an external review — the newness of the committee and that one of the members recused herself — were plausible. Finally, TPS's decision regarding Bronaugh's discipline had no impact on Greenberg as she had resigned prior to the conclusion of the investigation.

{¶ 39} Based on the foregoing, no genuine issues of material fact remain as to whether TPS took timely and appropriate action to address the harassment. Greenberg's second assignment of error is not well-taken.

### C. Greenberg's Resignation

{¶ 40} In Greenberg's third and final assignment of error, she argues that, after reporting Bronaugh's alleged harassment, her working conditions became so intolerable that a reasonable person in her position would have felt compelled to resign following her harassment complaint against Bronaugh. Greenberg states her decision was reasonable because she had general fear for her safety, including concerns regarding whether Bronaugh's keys and fob had been taken, the status of the building union representative (at the time, rumored to be Bronaugh's girlfriend), and the desire to avoid further harassment. She also maintains that someone gained access to her locked classroom, went through a collection of her posters, and hung a poster about gossiping in the room.

{¶ 41} As set forth above, to prove a hostile-work environment claim, a plaintiff must demonstrate "severe or pervasive" harassment. *Hampel*, 89 Ohio St.3d 169, 729

15.

N.E.2d 726, at paragraph two of the syllabus. A plaintiff can also raise a constructive discharge claim stemming from the harassment which "'stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment.'" *Godsey-Marshall v. Phillipsburg*, 2d Dist. Montgomery No. 23687, 2010-Ohio-2266, ¶ 23, quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). "'A plaintiff who advances such a compound claim, must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *Id.*, quoting *Pennsylvania State Police* at 147; *see also Mowery v. Columbus*, 10th Dist. Franklin No. 05AP-266, 2006-Ohio-1153, ¶ 27-28.

{¶ 42} In the present case, Greenberg admitted that she had no contact with Bronaugh after his suspension pending the investigation. She returned to school for only one day after lodging her complaint and prior to her resignation. The sole event that could conceivably be linked to her reporting Bronaugh's harassment was the poster about gossip placed on her classroom bulletin board. There is no evidence in the record as to who placed the poster or why it was on the bulletin board. Finally, and significantly, Greenberg resigned before the conclusion of the investigation and even in advance of her interview with the investigators in January 2013.

{¶ 43} Based on the forgoing, we conclude that a reasonable person in Greenberg's situation would not have felt compelled to resign. Greenberg's third assignment of error is not well-taken.

16.

## IV. Conclusion

**{¶ 44}** Upon due consideration, the May 16, 2022 judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, Greenberg is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Myron C. Duhart, P.J.

Charles E. Sulek, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.